# Bellas *against* M'Carty.

The acknowledgment of a sheriff's deed is a judicial act of the court, which can only be established by the production of the record of it. In a collateral proceeding parol evidence of an acknowledgment is inadmissible, either by witnesses present in court when it was acknowledged, or who saw the entry of the acknowledgment on the deed. So the deed itself is inadmissible, though it may have a certificate of acknowledgment on the back of it, if no registry has been made of it in court.

A *bona fide* purchaser of an estate, either legal or equitable, without actual or constructive notice, who duly recorded his deed, and in other respects pursued his claim with diligence, is to be preferred to a previous purchaser claiming under a sheriff's deed, the acknowledgment of which has never been registered.

In Pennsylvania the recording acts are applicable equally to legal and equitable titles.

ERROR to the common pleas of *Northumberland* county.

This was an action of ejectment by Hugh Bellas against William M'Carty and others for the undivided three-fourths part of a tract of land in Coal township containing one hundred acres. Each

x.—B*

party claimed under the same original title, and under George Derk; the plaintiff by a conveyance from Derk, and the defendants by a sale of the land, as the property of Derk, by the sheriff of Northumberland county upon a *testatum venditioni exponas* from Union county.   George Derk had an equitable title to the land, having held the same upon articles of agreement, upon which a part of the purchase money had been paid.   When the land was sold as the property of Derk, it was purchased by John Spees, the plaintiff in the judgment; and in order to establish this sale, the defendants gave in evidence the judgments and executions and returns of the sale to John Spees, and then offered to prove that the deed was lost and its contents; the defendants objected to this on the ground that it did not appear that the deed had ever been acknowledged, and that the defendants do not propose to show any record of such acknowledgment.   The court overruled the objection and sealed a bill of exception.   By the agreement between the plaintiff by his agent and George Derk, the consideration of the purchase was 300 dollars, 50 of which was to be paid absolutely, and was paid when the deed was given, and the payment of the residue was to depend upon the contingency of the plaintiff being able to keep the title; but this was in reference to another supposed outstanding title than that of which the defendants claimed under their deed from the sheriff.   And these facts gave rise to these questions: First, Whether the plaintiff was a *bona fide* purchaser without notice, such as would be protected in his title, under the circumstances?   Secondly, Whether a sheriff's deed has any validity without an acknowledgment in court and registry thereof?   Thirdly, Whether the fact of an acknowledgment and registry can be established by parol evidence, or in any other way but by the inspection of the record itself?   Fourthly, Whether the recording acts are applicable to equitable as well as legal titles? The particular facts of the case are so fully stated in the opinions delivered by the Judges, that it is not deemed necessary to state them more fully here.

The court below was of opinion that the recording acts were not applicable to equitable titles; that the registry of the sheriff's acknowledgment was not essential to the validity of the deed; and that the fact of acknowledgment might be established by parol.

*Bellas* and *Hepburn*, for plaintiff in error, on the subject of the necessity for an acknowledgment of a sheriff's deed in court, cited *Purd. Dig. tit. Execution, sect.* 7; 2 *Binn.* 218; 1 *Serg. & Rawle* 92; 2 *Serg. & Rawle* 426; 5 *Serg. & Rawle* 157; 1 *Penn. Rep.* 402; 2 *Rawle* 276; 2 *Whart.* 453, 468; 3 *Whart.* 363; 2 *Yeates* 454; 2 *Watts* 75; 6 *Watts* 288; 3 *Whart.* 424, 440; 2 *Conn. Rep.* 527; 3 *Conn. Rep.* 406.   The acknowledgment of a sheriff's deed is a judicial act of the court and must therefore be recorded.   2 *Binn.* 218; 1 *Serg. & Rawle* 192; 16 *Serg. & Rawle*

[Bellas v. M'Carty.]

299; 4 *Whart.* 291; 13 *Serg. & Rawle* 335; 1 *Stark. Ev.* 169;
*Gressly Ev.* 107–9.  The imperfect minutes of the clerk are not
the records of the court, nor are the evidence of it.  9 *Johns.* 287;
1 *Bay* 256; 1 *Watts* 426; 1 *Phil. Ev.* 218; 16 *Johns.* 265; 3
*Whart.* 251; 8 *Watts* 156.  The recording acts were intended to
remedy an evil which existed in regard to equitable as well as legal
titles.  *Purd. Dig.* 198, *act of* 1715; *act of* 1775, *sect.* 6; 3 *Serg.*
*& Rawle* 429; 4 *Rawle* 444.   One who has an equitable title
may dispose of it and convey it, so as to entitle his vendee to de-
mand the legal title.  2 *Yeates* 259; 2 *Binn.* 40.  A purchaser at
sheriff's sale is protected by the recording acts.  1 *Rawle* 325; 3
*Yeates* 126. 351; 2 *Binn.* 455; 2 *Serg. & Rawle* 44; 3 *Serg. &*
*Rawle* 433; ·6 *Binn.* 118; 5 *Serg. & Rawle* 257; 1 *Story's Eq.*
390; 1 *Johns.* 398; 2 *Johns.* 510; 13 *Johns.* 371; 2 *Cains* 61; 6
*Johns. Chan.* 417; 4 *Cowan* 599; 1 *Page Chan.* 263; 1 *Peters*
244.  On the subject of notice, 2 *Watts* 79; 4 *Kent. Com.* 172; 8
*Serg. & Rawle* 484.

*Donnel* and *Greenough*, for defendants in error, contended, that
there was no act of assembly requiring that the acknowledgment
of a sheriff's deed should be recorded.   They cited the act of 1705,
*Purd. Dig.* 290; 13 *Serg. & Rawle* 335; 1 *Dall.* 69; 2 *Yeates*
455; 6 *Binn.* 255; 2 *Penns. Rep.* 231; 3 *Whart.* 25; 7 *Watts*
438; 5 *Watts* 77. 221.  The plaintiff was not a *bona fide* pur-
chaser without notice, 8 *Watts* 374; 3 *Serg. & Rawle* 423; 11
*Serg. & Rawle* 392; 2 *Watts* 459; *New. on Con.* 405; 2 *Mad.*
*Chan.* 323; 2 *Story's Eq.* 716, *sect.* 1502; 4 *Watts* 362; 1 *Story's*
*Eq.* 75, *sect.* 57. 525, *sect.* 630; *Sug. Vend.* 530.

The opinion of the court was delivered by
ROGERS, J.—This was an action to recover the undivided three-
fourths part of a tract of land in Coal township, in the county of
Northumberland.

The title of the plaintiff commences with a patent to Samuel
Clarke, dated the 11th of April, 1776, from whom he deduces his title,
thus: Deed, Clarke to T. Johnson:—Articles of agreement between
Johnson and Abraham Cherry, and an assignment by Abraham
Cherry to John Cherry:—28th April 1813, articles of agreement
between John Cherry and George Derk, recorded 26th Aug. 1814:
—17th April 1815, Saxton and Wolverton, administrators of John
Cherry, conveyed the same property to George ·Derk, under an
order of the Orphans' Court:—22d December 1829, articles of
agreement between George Derk and Christian Bower, acknow-
ledged 24th December 1829, and on the same day—deed, George
Derk to Christian Bower, recorded the 24th December 1829:—28th
December 1829, Christian Bower conveyed the property to the
plaintiff, Hugh Bellas, which was recorded the same day.

[Bellas v. M'Carty.]

The defendant commences his title with George Derk, under whom both parties claim.

To the May term 1820, Peter Richter, who was the assignee of John Spees, obtained a judgment in the common pleas of Union county, against George Derk for 540 dollars. This judgment was entered the 3d April 1820. The 25th December 1820, *testatum* was issued to Northumberland county, return *tarde venit*, and on the 25th May 1821, the land in controversy was levied by the sheriff of Northumberland county, inquisition held and condemned. A *testatum venditioni exponas* issued, which was returned unsold, and an *alias testatum venditioni exponas* to the 22d February 1822, was returned sold to John Spees; viz. 100 acres, more or less, for 67 dollars. This is all that appears on the record in reference to the sale. It is alleged, and proof has been given, that James R. Shannon, who was at that time the sheriff of Northumberland county, gave a deed for the premises to the purchaser, but there is no record of the acknowledgment of the deed either on the record of Union or Northumberland county. It is also alleged, and proof has been given, that John Spees assigned the premises to P. Moore, on the back of the deed. The deed has been lost in some way, and parol proof has been given of the deed and the assignment. The defendant farther gave in evidence a judgment of the executors of George Moore against the executors of P. Moore. On the judgment a *testatum* was issued 1st February 1828, and the lands in dispute were levied on, and on the 3d May 1829, were sold to Samuel Siegfried for 100 dollars. On the 17th August 1829 the sheriff gave a deed for the premises to Siegfried, which, with the *testatum fieri facias*, &c., was duly recorded in the county of Northumberland. The 4th February 1830, deed from Siegfried to A. Jordan, for the undivided half of the property sold to Siegfried as the property of Moore, for the consideration of 50 dollars, with special warranty: recorded 15th June 1830, 50 dollars paid. The 5th January 1831, deed, Alexander Jordan and wife to Wm M'Carty *et al.* for the same property, consideration 500 dollars, with special warranty. The 29th January 1831, Peter Lazarus, who was the administrator of Samuel Siegfried, petitioned for leave to sell the remaining undivided half part of this tract, which was ordered by the orphans' court. The property was sold by the administrator, and purchased by Wm M'Carty for 565 dollars, and on the 28th April 1832, the sale was confirmed. The 15th March 1833, Peter Lazarus executed a deed to Wm M'Carty. The 25th April 1832, Roger Wolverton, who was the administrator of John Cherry, made a deed to Wm M'Carty and Alexander Jordan for the undivided half of the tract, containing 50 acres, consideration 150 dollars; and on the same day, and for the same consideration, Wolverton, administrator as aforesaid, conveyed the other undivided moiety to Wm M'Carty. By these conveyances, Wm M'Carty became entitled

to the three undivided fourth parts of the tract of land for which the ejectment is brought, the other one-fourth part being in Alexander Jordan.

It also appears that George Derk, under whom both parties claim, on the 9th June 1818, entered into articles of agreement for the sale of the land to George Durbleberger for the sum of 866 dollars, payable in instalments. On this contract Durbleberger paid 66 dollars, took possession of the land, and continued in possession, but for what space of time, is unknown, cut timber off the land to reimburse himself for the same, and as it seems to be conceded by both parties, then abandoned his contract. It is also a part of the case, that neither Spees the purchaser at the sheriff's sale, nor his assignee Moore, ever took possession, nor is there any proof that they, or either of them, ever paid taxes.

This is a general outline of the case, and on this several questions depend. ·

After giving in evidence the judgment of Richter, for the use of Spees *v.* Derk, and the proceedings thereon, the defendants then offered the receipt book of sheriff Shannon, to prove the existence of a sheriff's deed for the premises. They also offered to prove, that the deed was delivered by James Merill to John Spees. That diligent search has been made for it, and that it cannot be found. That it is either lost, or has come to the plaintiff's hand, and that notice has been served on him to produce it.

The plaintiff objected to this testimony, because there was no acknowledgment of the deed in open court, or record made of it by the prothonotary.

The court, however, admitted the testimony, whereupon the defendant proved by the evidence of several witnesses, after having given the receipt as above stated in evidence, that a deed for the premises was delivered by the sheriff to James Merrill, the plaintiff's attorney, who handed the same to Jacob Spees, who delivered it to the purchaser John Spees. It was also proved, that Spees made an assignment of the premises, on the back of the deed to Philip Moore. The defendant also made proof, that diligent search had been made for the deed, but without success. If the witnesses are to be believed, the existence of the deed is fully shown, and of the assignment of it to Moore, no reasonable doubt remains; a diligent search has been made, and it has been lost or mislaid. But there is no evidence which has any tendency to show that Bellas has, or ever had, the deed in his possession, or was aware of its existence. In the course of the examination, the defendant asked one of the witnesses this question, " Had you any particular reason or cause, to deliver the deed to Mr. Bellas, [and do you believe you delivered it to him, for any purpose connected with your estate?]" The court allowed the latter part of the question to be put to the witness, the part in brackets, and overruled the rest.

[Bellas v. M'Carty.]

After giving this evidence, the defendant then offered the record of the judgment of the executors of George Moore against Philip Moore, from Union county, the proceedings thereon, including the *testatum* to Northumberland county, the sale of the premises to Samuel Siegfried, with the record of its acknowledgment by the prothonotary of the county of Northumberland, together with the record of the *testatum* in the same county.

To this testimony the plaintiff objects, because the defendant has shown no title to the land in controversy, in Spees or in Moore; it being admitted that there is no record of the acknowledgment, nor any registry of the deed by the prothonotary, or recorder, either of Union or Northumberland county.

The defendant then proposed to ask Mr Merrill, whether the deed from the sheriff, was acknowledged in court, and certified by the clerk. For this purpose, notwithstanding exception was taken to it by the plaintiff, the court permitted the examination of Mr Merrill.

He testified in substance, " That he could not say that it was acknowledged, nor positively that it was not. That he cannot recollect much of the facts; that he had forgotten them, until he saw his receipt: has no sort of recollection that there was a certificate to it, but his impression is strong, that there was none, and he has strong doubts whether there was an acknowledgment: Shannon who was the sheriff, was pretty consequential about that time, because Spees did not come and bring him up the money: Shannon said, he had sold the tracts for Richter, who was the plaintiff, and Spees had no right to the judgment, and would not be good for the money. He insisted the money should be paid into court." Mr Merrill says, " he thought the deed should be acknowledged in the county from which the writ issued. He never called on Shannon as he recollects, to do any thing more in the business. He says he would have had no recollection about it, but for the receipt shown here, &c., and other papers. It was intended the deed should pay so much of the debt. Never saw the deed in the hands of Philip Moore or his executors, and does not know that the deed corresponded with the levy. Not sure he read it. Has no distinct recollection either from the receipt or return or record, whether both tracts were sold, or one only. Has no recollection of looking into the deed. He thinks there could not have been a certificate without his knowing it, but he does not say, there was not one. The strongest impression on his mind is, there was not one. He is almost positively certain, nay quite convinced, he never saw a certificate."

The defendant again after this examination, offers the record, &c., as before. To which the plaintiff objects, for the same reason as before stated. The court on argument, admitted the testimony, to which the plaintiff excepted.

The plaintiff insists that there is error in the admission of the

[Bellas v. M'Carty.]

testimony contained in the four bills of exceptions, and in the special instruction to the jury, and in refusing to instruct them as requested in the fourth, fifth, seventh and eighth points of the plaintiff.

The bills of exceptions and the charge of the court may be resolved into several general propositions, the division of which will supersede the necessity of examining each in detail.

It cannot be denied, that the defendant has given satisfactory proof of the existence of the sheriff's deed, and of the assignment of the premises to Philip Moore. He has also shown, that diligent search has been made, but that both the deed and the assignment have been lost or mislaid. But it is not so clear, that he has been equally successful in establishing the fact, that the deed was ever acknowledged. It is not pretended, that there is any record of the acknowledgment existing either in Northumberland or Union county. But the effort has been to show, directly or by inference, that the deed was acknowledged in open court, and that an entry was made to that effect by the prothonotary on the back of the deed. This was an affirmative proposition, the proof of which devolved upon the defendants, and for this purpose, they proposed to ask James Merrill, whether the deed from sheriff Shannon was acknowledged in court, and certified by the clerk. The amount of his testimony is, " that he does not know that the deed was acknowledged. Has no recollection that there was a certificate on the deed. Thinks there could not be one without his knowing it. He is certain, nay absolutely sure he never saw a certificate." Mr Merrill, who, it must be recollected, was the defendant's witness, and whose character is without reproach, gives some reason for the opinion that the deed was not acknowledged; such as his recollection that Shannon was under the impression that the judgment did not belong to Spees but to Richter; that Spees was not good for the amount of his bid, and that he could be secure only by the payment of the money, and the same being brought into court. The result of this evidence, most certainly, is an expression of an opinion on the part of the witness introduced and examined, be it remembered by the defendant, that the deed was neither acknowledged, nor was there a certificate of acknowledgment by the prothonotary on the deed. But this fact, which is considered essential, is sought to be established by the inference, that Mr Merrill, who was the attorney of Spees and Richter, and the sheriff and the prothonotary have performed their duty, which duty the defendant alleges, consists in having the deed duly acknowledged in open court, and having the same certified by the prothonotary on the back of the deed. But the argument is neutralised by a countervailing inference, that the prothonotary is presumed to have discharged his duty, and that the presumption, that if the deed had been acknowledged, as is directed by the act, the acknowledgment would have been registered. The argument proves nothing. It is certainly the duty of the sheriff to acknowledge the deed, but it

[Bellas v. M'Carty.]

is not his province, nor the clerk's, to make a certificate of the fact, nor is the sheriff bound to act until payment of the purchase-money.

The acknowledgment, which is a judicial act, can only be made in open court, and by the order of the court only, can it be recorded; and this must appear, as will be hereafter shown, on the record of the court alone. There is no law which authorizes, or requires, that a certificate shall appear upon the deed, although the practice has been pretty general to make a memorandum to that effect on the deed, after it has received the sanction of the court. Insinuations have been made, that the deed has, in the language of the counsel, been spirited away; but of this there is not a shadow of evidence, and of course, must be determined by conjecture; there is as much reason, viz. that is none at all, for believing, that the deed has been suppressed, because there was no memorandum upon it. But no such charge can with any propriety be made, against either party; such surmises ought not to weigh a feather, either with the court or jury. It seems that Mr Merrill had some doubt at the time, whether the acknowledgment should be taken in Northumberland or Union; he rather thought it should be registered in the latter county. This, connected with the difficulties made by the sheriff, with the then trifling value of the property, may account for his taking the deed, as is undoubtedly his impression, without any acknowledgment, and that without any serious imputation against his character, as a careful and skilful lawyer, and an honest, conscientious man. It may be remarked also, that although several of the witnesses speak of the existence of the deed, yet there are none who testify to the acknowledgment. From the best consideration that can be given to this part of the case, the conclusion is inevitable, that there is no evidence whatever, of any acknowledgment by the sheriff, and that nothing has been proved, from which either the court or the jury, can legitimately infer it. The case therefore stands (and this is the best point of view in which it can be considered for the defendant) in the same light, as if the deed had been produced and offered without any evidence of an acknowledgment, either on the face of the deed or on the records of the court. The question then fairly arises, whether the defendants have shown such a title in Spees and Moore, as entitles them to give in evidence the judgment of Moore's executors and Philip Moore against Bellas, who, as will be hereafter shown, is a *bona fide* purchaser for a valuable consideration from Derk, under whom both parties claim. On the bill of exceptions, and on the charge of the court, several interesting points will arise. Is a sheriff's deed such an instrument as must be acknowledged in court, to be valid against a subsequent purchaser, from the defendant, without notice, actual or constructive? In this is included the question, whether the acknowledgment is a judicial act, which must be entered on the record.

It has been already shown, that there is no evidence of acknowledgment on the face of the deed, and if there was, it would make

[Bellas v. M'Carty.]

no difference so far as this point is involved, as we deem it absolutely necessary, that the entry by the proper officer should be made on the minutes, or records of the court, in order to affect a *bona fide* purchaser with notice.   And here we wish to be distinctly understood, as taking a distinction between the defendant in the execution, and a purchaser of his interests without notice, either actual or constructive.   It is not necessary to contend, that Derk would or would not be postponed as against the purchaser, who had paid for the land, or, what is equivalent to it, had permitted a credit to that amount on his judgment.   By the purchase, he acquires an interest in the land, although the deed may not have been acknowledged. This interest descends to his heirs and it may be taken in execution.   The purchaser or his heirs may call for the execution of the deed, by payment of the amount of the bid, and the court, on a proper application, may compel the sheriff to acknowledge the deed.   It is also possible, that under very peculiar circumstances, this defect would be cured, as in the case of the Lessees of Duncan *v.* Robinson, 2 *Yeates* 434.   There the deed was acknowledged, but not till after the commencement of the suit.   The court admitted it as evidence, stating, that the deed does not take effect upon its acknowledgment, but from its sealing and delivery.   Every thing relates to the first act; but the acknowledgment being made at a late day, the defendant is at liberty to go into every objection against the sale which might have been made, if the deed was now offered for acknowledgment, as in common cases.   Duncan *v.* Robinson was the suit of the purchaser at the sheriff's sale, against a third person, who claimed by title, independent of the defendant in the execution.   The defendant in the execution made no objection on that account, and the deed was acknowledged in court, on petition, of which the defendants in the execution must have had notice. The court in such a case, might well say, that the deed did not take effect from its acknowledgment, but from its sealing and delivery, and that every thing related to the first act.   The defendant might be well satisfied with this decision, particularly as the court reserved to him the right of going into every objection against the sale, which might have been made, if the deed was then offered for acknowledgment.   And to the same effect is the case of Moorehead *v.* Pearce, 2 *Yeates* 456, which was determined on the authority of Duncan *v.* Robinson.   In the latter case, it was admitted, that many of the public papers had been lost and destroyed, owing to the war, the burning of Hannahstown, where the office was kept, and the frequent removal of them by a change of prothonotaries during the war.   Under these peculiar circumstances, the court decided, that the want of the usual proof did not vitiate the sale.   "The words of the act," (the act of 1705,) says the court, "are only directory," (in which, with all deference, subsequent cases show they were mistaken,) "and do not invalidate a sheriff's deed, for want of an

x.—c

[Bellas v. M'Carty.]

acknowledgment in court.    Such an acknowledgment does not
appear to be indispensably necessary in all given cases, &c.    On
the whole, we think, the present deed may be supported without
the usual acknowledgment, after so great a lapse of time, and no
objection made to it by the debtor.    But in its operation, it is sub-
ject to every exception, which may be had against a sheriff's deed,
on its acknowledgment being offered in court."    In Steever *v.* Rees,
3 *Whart.* 21, and Morrison *v.* Wentz 437, the principle was decided,
which is not disputed, that a purchaser at a sheriff's sale, before his
deed has been acknowledged, has an inceptive interest in the land
by the contract.    But although cases establish the point, that an
acknowledgment is not indispensably necessary, in all given cases,
yet, it by no means follows, that the sanction of the court which has
ever been required since the settlement of the province, and which
has been endorsed by various acts of assembly, is an idle ceremony.
*Exceptio probat regulam* is a maxim, which may be aptly applied
in answer to the case cited on this point by the defendants.

At a very early period attempts were made, by statute, to estab-
lish a system for the registry of conveyances in the province, a his-
tory of which is very clearly given by Mr. Justice Sergeant, in his
valuable Treatise on the Land Law of Pennsylvania, page 237.
By an act which passed in 1683, (25 Charles 2,) the legislature
prescribed a form of conveyances, and decided that they should be
acknowledged in open court, and certified under the clerk's hand
and seal, and should be registered.    It is very probable that from
hence we may date the origin of the practice of acknowledging a
sheriff's deed in open court, and the registering of it in the pro-
thonotary's office, which is referred to by Chief Justice M'Kean, in
Snyder's Lessee *v.* Nargar, 1 *Dall.* 68, which he says *is always
done.*    And also the phraseology of the act of 1705, which directs
that the sheriff shall give the buyer a deed, duly executed and
acknowledged in court, for what is sold, *as has been heretofore
used* upon the sheriff's sale of lands.    The phrase, " *as has been
heretofore used,*" and " *as is always done,*" used by the chief
justice, are pregnant with meaning, and show the notions enter-
tained at that day of the universality of the practice of not only
acknowledging the deed, but also of making a registry of it in the
proper office.    In Adams and another *v.* Thomas, Chief Justice
Tilghman calls the acknowledgment, the sanction of the court to
the act of the sheriff, and such it has been considered in the numer-
ous authorities which have been cited at the bar.    In this state the
reception of an acknowledgment of a sheriff's deed, is a judicial
act in the nature of a judgment of confirmation of all the acts pre-
ceding the sale, curing all defects in process on its execution, which
the court has power to act upon.    1 *Bald.* 272; Thompson *v.*
Phillips, 10 *Peters* 472.    When the acknowledgment is once taken,
every thing which has been done, is considered as done by the
previous order or subsequent sanction of the court, and cannot

[Bellas v. M'Carty.]

afterwards be disapproved of, collaterally.  1 *Serg. & Rawle* 101; 4 *Yeates* 214; 6 *Binn.* 254; 2 *Serg. & Rawle* 54, 55.

The acknowledgment of a sheriff's deed is the official proceeding of a court of record, acting judicially in relation to the matter before it.  Ordinary deeds may be acknowledged before a judge or justice of the peace, but a sheriff's deed can only be acknowledged under the supervision of a court.  The taking of the acknowledgment is an act as purely judicial as the awarding of the execution on which the land was sold.  Till such deed is acknowledged, the legal title does not pass; the vendee cannot demand the rents or recover the possession.  By the act of 1802, the deed acknowledged, is made conclusive evidence of the purchase.  The jurisdiction or relation to the acknowledgment of a sheriff's deed, is accompanied by the power to set aside the sale, and confirm it, to distribute the moneys paid into court, and to award issues.  It is a judicial proceeding, conducted with all the solemnities of a court of record, affecting matters of the highest moment, and involving, wherever the acknowledgment is received, adjudication on the validity of the sale, and the rights of the parties to the execution and the purchase. Hoffman *v.* Coster, 2 *Whart.* 469.  There is a marked distinction between sheriff's deeds and other deeds in this particular.  The former are judical acts, and require the sanction of the court, and therefore the acknowledgment must be registered by the court; whereas the latter are intended merely as process and execution; for which reason the act of 1719 expressly directs, that the justice shall, under his hand and seal, certify the acknowledgment or proof upon the back of the deed.

In the face of all these authorities, and the whole current of cases which have been cited at the bar, it was with surprise we heard an intimation from the counsel, that, if the court should decide it was necessary that such a proceeding should be entered on the record, it would be nothing more nor less than judicial legislation, inasmuch as it is no where expressly directed that the act of acknowledgment should be perpetuated by an entry on the record. If this argument proves any thing, it also proves that it would be judicial legislation to require that it should be noticed on the deed, or that any notice in writing should be taken of it whatever.  From this course of reasoning, it will follow, that a solemn judicial adjudication or record, which imports absolute verity, may rest on the frail recollection or memory of man.  That it may be proved as any other fact by witnesses.  Of this we have a practical example in the course pursued here, for Mr Merrill was examined to prove that the deed, although no record was made of it, was acknowledged in conformity to the act, in open court by the sheriff.  This is among the very few attempts which have been made so to establish a record by parol, and it is most sincerely hoped it may be the last.  If this experiment should receive countenance, we must not be surprised that the judgments of every court in the common-

wealth will rest in parol, and be established, not as has been heretofore done, by inspection of the record. Nor was it necessary that there should be an express direction to that effect in the act, as it is an incontrovertible and a universal rule, that every judicial act or judgment of the court, whether prescribed by the common law, or by statute, must be recorded. To keep regular minutes of the proceedings of all courts, and particularly of courts of record, dockets are provided, and clerks and prothonotaries are appointed. The entries, although made by the officers selected for that purpose, are the acts of the court done by their authority, and are under their supervision and control. A court of record is that where the acts and judicial proceedings are enrolled for a perpetual memorial and testimony, which rolls are called the records of the court, and are of such high and supereminent authority, that their truth is not to be called in question. For it is a settled rule and maxim, that nothing shall be averred against a record, nor shall any plea or even proof be admitted to the contrary. And if the existence of a record be denied, it shall be tried by nothing but itself, that is, upon bare inspection, whether there be any such record or not; else there would be no end of disputes. But if there be any mistake of the clerk in making up such record, the court will direct him to amend it. But it is a fundamental principle, which admits of but few exceptions, that the want of a record or an entry on the record, cannot be supplied by parol testimony in a collateral proceeding.

The judgment itself, and all the proceedings upon it, are carefully registered and preserved, under the name of records in public repositories, set apart for that particular purpose. *Co. Lit.* 260; *Fonbl.* 231; 3 *Black. Comm.* 24; 1 *Black. Comm.* 68.

The usual mode of proving a record, is by the production of the record itself, or by a sworn or office copy. But in *Peake's Ev.* 29, 30, on the authority of Thompson *v.* Bullock, 1 *Bay* 364, it is said, that although inferior evidence of the contents of a record which is shown once to have existed, may be admitted, especially in cases where the record is the only inducement to an action, yet the inferior evidence must be above the degree of mere parol proof. But this evidence presupposes the existence of the record, and is admitted from necessity, because the records, which, for security, are preserved in public repositories, cannot be removed, from place to place, to serve a private purpose. The most solemn instruments may, it is true, be presumed to have existed to support a long uninterrupted possession. So where an ancient or even a recent record is lost, the contents of it, if they can be ascertained, may be supplied by inferior testimony, by an application to the court where the records are deposited. But where the court has omitted to have a record made of a judicial proceeding, it would be dangerous to the rights of suitors, and particularly to third persons, to permit the record to be made up on parol proof or their own recollection, after the lapse of several years. Certainly this would not be done in prejudice of

[Bellas v. M'Carty.]

third persons, whether by a direct application to the court, having the care of the record, or on a collateral proceeding. It is a strong feature in this case, that the purchaser at the sheriff's sale, sold on a *testatum* from another county, neither had possession of the property, paid the taxes, had his deed acknowledged, nor did any act whatever to give notice that he had become the owner of the land. Under these circumstances, it may conduce to a correct understanding of the case, to inquire whether the defendants, who claim under Spees, are in a better situation than Spees himself, and connected with this to examine whether the plaintiff is a *bona fide* purchaser without notice. It is unnecessary to review this question in its relation to the owner of the land, as whose property it was taken and sold by the sheriff. But I must remark that even in that aspect the title of the defendants is by no means free from doubt. Till the sheriff's deed is acknowledged, the legal title does not pass, and the vendee cannot demand the rents, or receive the possession. Hoffman *v.* Coster, 2 *Whart.* 469. Nor would a purchaser, or those who claim under him, be within the principle of the cases of the Lessee of Duncan *v.* Robinson, and Moorehead *v.* Pearce, 2 *Yeates.* They differ, as has been already shown, in many important particulars, which it is unnecessary to report. But be this as it may, is the plaintiff in the same, or is he in a better situation than Derk, from whom he purchased? And this depends on the solution of the question; whether he is a purchaser without notice? The defendants contend that he is not entitled to protection, because he is the purchaser of an equitable title. And of this opinion was the court who charged the jury; that the plaintiff has purchased only an equitable interest from one who never had any thing more than an equitable interest or title, imperfect on its face. The plaintiff must, therefore, stand in no better situation than Derk, from whom he bought. It is certainly a most inconvenient and mischievous doctrine, that, because one link in the chain of a long title should be (so to speak) broken by a neglect to convey a legal title, therefore all subsequent purchasers of the property are put out of the protection of the recording acts. With all due respect to those who hold this opinion, the position is as absurd as it is contrary to the act itself.

To put equitable titles on a different footing from legal titles, would be intolerable in Pennsylvania, where we have no means of compelling the conveyance of the legal title, and where one-third or perhaps one-half of the estates are in the same predicament. And this has been the view taken of the act in the numerous cases which have been cited, to notice which particularly, would swell this opinion to an unreasonable extent.

The act of 18th March 1775 is not confined to deeds, but directs that every recorder of deeds, &c., shall keep a fair book, in which he shall immediately make an entry of every deed or *writing* brought into his office to be recorded. The language of the act is

x.—c*

[Bellas v. M'Carty.]

sufficiently comprehensive to embrace equitable as well as legal titles, and the record of an equitable title is notice to all subsequent purchasers. It is not doubted, that a free conveyance, duly registered, operates to give full effect to the legal and equitable estate conveyed thereby, against a subsequent conveyance of the same legal and equitable estate. Where a person has purchased an equitable title, which he has taken care to put upon the record in conformity to the directions of the act, it would be difficult to persuade any person that there was any justice in postponing his right in favor of a subsequent purchaser. This in truth will not be pretended. And when a purchase has been made of an equitable estate, which has undergone one or more operations by legal conveyances, which have been immediately recorded, why should a second be postponed to a prior purchaser, who has neglected to have his deed recorded, who has neither paid taxes nor taken possession of the property, and who has done no act or thing in assertion of his right, calculated to give notice of his claim. Justice and sound policy would seem to require that in such cases nothing short of clear, positive and explicit notice, should prejudice the right of a second, fair and *bona fide* purchaser. But it is said that the defendants have clothed themselves with the legal title, and that where the equities are equal, the maxim is, *qui prior in tempore potior est in jure.* These elementary principles are not denied, but they have no application to the facts of the case. The rule only applies between persons who have been equally innocent and equally diligent. The parties are not in equal equity. One has been vigilant and the other sleepy, and this leaves room for the application of the maxim "*vigilantibus non dormientibus jura subveniunt.*" And when one of two innocent persons must suffer, the loss should be thrown on him whose negligence caused it. It was the duty of the purchaser to have the deed acknowledged in open court, as is directed by every act which has been passed in relation to this matter, and it was his farther duty to see that a proper registry was made of the acknowledgment; and this has been repeatedly decided to be equivalent, and of equal effect, as any other deed recorded in the recorder's office. If this was omitted, either from the neglect or the ignorance of the purchaser or his counsel, the loss cannot with any show of justice be visited on an innocent third person. The idea of Mr Justice Lewis as to equitable estates, would seem to have been taken from some general expressions of the present chief justice in Chew *v.* Barnitz, 11 *Serg. & Rawle* 389. But the remarks there must be viewed in reference to the case decided, and cannot in this state, where equitable and legal estates are, for most purposes, on the same footing, without the most glaring injustice, be generally applicable to equitable interests. The case was this:—By articles of agreement, dated the 7th September 1794, William Parker and Moore Wharton sold to James Wilson, a large tract of land, and covenanted that they, who were the then

owners, would have the patents taken out in his name. In consideration whereof he agreed to pay them so much per acre, and to execute bonds for the purchase-money, and a mortgage on those or other lands of equal value as a security. On the 17th March 1795, Judge Wilson, in consideration of a large sum of money or stock advanced by Mr Chew, conveyed to him 36 of these tracts of land, with covenants of special warranty, and for further assurance, on the 12th July 1795, Jeremiah Parker, who was one of the defendants in the ejectment brought by Mr. Chew, and who was concerned with Parker and Wharton, and who took out the patents in his own name, conveyed to Judge Wilson the legal title to the land, which Wilson had previously sold to Chew. On the 14th October 1795, Judge Wilson executed bonds to Jeremiah Parker for 25,122 dollars, and to Parker and Wharton for 12,000 dollars, and a mortgage to the two latter to secure the payment of the above mentioned bonds and other debts to a large amount. Mr Chew contended, that the subsequent acquisition of the legal title enured to his benefit. But the court was of opinion and so decided, that this could not be because being but the owner of an equitable title, he stood in no better situation than Judge Wilson. That it was his duty to trace the title back to the owner of the legal estate, and if this had been done, he would have discovered that the vendors of the land had an article of agreement with Wilson, in which there was an express covenant for the execution of bonds to secure the purchase, and a mortgage on these or other lands. That he was bound to examine the title which he purchased; but that, instead of doing this, he relied on a representation which turned out to be without foundation in fact. That an inquiry would have led to a knowledge that it was merely equitable, and subject to the covenants in favor of the original vendors. The equity between them was not equal, for Mr Chew had been guilty of laches, and was therefore not entitled to favour. The conveyance of the legal title to the mortgagor was made expressly with the view to receive the mortgage from Judge Wilson in pursuance of his covenants entered into previously to the conveyance to Mr Chew. This is the substance of the case, and if the defendants here had derived their title from the owner of the legal estate by an antecedent contract, then it would have been the duty of Mr Bellas to trace the title back, and to make the necessary inquiries at the fountain head, viz. to the owner of the legal title, and this would have led him to a knowledge of the title under which they claim; if he had neglected to do this, he would have been, as Mr Chew was, without equity, and the subsequent acquisition of the legal title, would have been available. But in this case the defendants, as well as the plaintiff, claim under Derk, and all Mr Bellas was bound to do, was to inquire of Derk. If he had inquired of the owners of the legal estate, what would have been the result? It would have been fruitless, and ended in nothing. They were as ignorant of the sale of the pro-

perty to Spees as the plaintiff. They had the means of information that he had, and no more. Surely, therefore, a man's title cannot be affected because he omitted to do that which would have necessarily produced no advantage whatever, and which would not, by any conceivable means, have enabled him to avoid the loss to which he has been exposed by paying the money for a worthless title. The maxim *lex neminem cogit ad vanum seu impossibile*, applies with peculiar force, particularly as against persons who claim under a man who has altogether omitted to perform a duty which the law casts upon him. Christian Bower who purchased the property as the agent of Mr Bellas, testifies that he received no notice of any other claim when he purchased of Derk, than Dunkleberger's; Derk told him of no other, and he heard of no other. Whether Derk was himself aware that the property was sold by the sheriff, does not appear, and is immaterial, as it was not communicated to Bower. The probability is, he did not know it, as a contrary supposition would affect him with fraud, and because it might well be that he should be ignorant of a sale conducted as this appears to have been, and of which he may have had no express notice. This case then stands unaffected by the principle declared in Chew *v.* Barnitz, a misapprehension of which has led the court into this error.

But was Mr Bellas a *bona fide* purchaser for valuable consideration and without notice? A notice is either actual or constructive. In the remarks which have been already made, I have endeavored to show that Mr Bellas had not constructive notice. The defendants, however, have been permitted to give in evidence proof of the existence of a deed from the sheriff to Spees, a conveyance by assignment of Spees to Moore, a levy on the premises as the property of Moore, a sale and deed by the sheriff regularly acknowledged and recorded, to Siegfried under whom the defendants claim. A doubt has been suggested, whether this will operate as notice to Mr Bellas. But this cannot affect the title of the plaintiff, because, granting that he knew of the inquisition and sale of the property to Spees, of which, by the by, there is not a particle of proof, all he was bound to do, was to ascertain (which could only be done by recourse to the record of the common pleas of Northumberland) that the deed had not received the sanction of the court, and his inquiry was at an end. He was not required to search further, and to inquire either of the sheriff or Spees, whether the deed had in fact been acknowledged, although no minute of it had been made as is required by a proper construction of the act. He is not bound to search after secret conveyances, and the more especially in such a case as is here presented, where the parties have neglected to take possession, or to assert their rights. A person is not visited with the consequences of constructive notice on slight grounds. In the Lessee of Heister *v.* Fortner, 2 *Binn.* 40, it is held that the registry of a deed defectively proved or acknowledged,

[Bellas v. M'Carty.]

is not constructive notice to a subsequent purchaser, although the registry be made in the proper county. To the same effect many other cases have been cited at the bar, to which, for a reason before stated, I refer generally. As to the allegation that Mr Bellas had actual notice of the conveyance to Spees, it is an allegation without proof. Publicity of the sale, and the fact that Mr Bellas was an attorney, amount to nothing, where the inquiry is into the title of a valuable tract of land for which the party has paid his money, and where, in addition, he has pursued his right diligently and without unnecessary delay.

But it is insisted that from the terms of the contract between Bower and Derk, Mr. Bellas, who takes the place of Derk, is not entitled to the protection afforded by the character of a *bona fide* purchaser. To entitle himself to this protection, the purchase must not only be *bona fide*, and without notice, and for a valuable consideration, but he must have paid the purchase money; but whether he is the purchaser of the legal or equitable title, can make no manner of difference. 2 *Hay's Eq.* 716; *Taite* 502. This doctrine of the courts of chancery has been recognised in this state, in Yost *v.* Marten, 3 *Serg. & Rawle* 430; The Union Canal Co. *v.* Young, 1 *Whart.* 410; and in Rogers *v.* Hall, 4 *Watts* 359. The English rule has been somewhat modified, as appears by the case of Yost *v.* Marten, and, carried to its utmost extent, it would be anything but a rule of equity. It remains yet to be decided, that, when valuable improvements have been made by an innocent purchaser, he can be ousted by a prior equity when there has been no negligence on his part. There is an important difference, as is seen in Yost *v.* Marten, between the laws of England and Pennsylvania. By our recording act of 15th March 1785, every man who has articles of agreement affecting the title of land, may place them on record, which will be notice to all the world; so that he who does not place them on record is guilty of laches. In consequence of this law, it is the custom for purchasers to search the records before they pay the money; and if they find nothing there, they conclude they are safe. But in England such articles are not recorded, and the purchaser relies on the possession of the title papers. In England, therefore, some blame is imputable to the second purchaser, but none to the first purchaser, who has done all he has been required by law to do; whilst in Pennsylvania it is directly the reverse; the first purchaser is guilty of laches by neglecting to put his agreement on record, whilst the second has used due and proper diligence by registering his conveyance in proper time, and by taking possession of the property. In Pennsylvania, therefore, there is not the same reason, for the rule in all its strictness; and I have no disposition to extend it one jot beyond the cases that have been already decided. Does then Mr Bellas come within the rule, or in other words, does the purchase-money, or any part of it, remain unpaid? We think that it does not. The

[Bellas v. M'Carty.]

money which the purchaser is absolutely bound to pay, is by the contract 50 dollars only, all of which was paid at the time, or shortly after, and before he had notice of any adverse claim, except by Dunkleberger, whose title is disclaimed by plaintiff and defendants. In addition to this sum, for which he is absolutely bound, and which is paid, he is liable in the contingent event of establishing his right, to pay to Derk a further sum, in the whole amounting to 125 dollars. In effect, the contract amounts to little more than a warranty of title on the part of the vendor, with a stipulation that, instead of paying it to Derk, with an agreement for its repayment on the failure to establish the title, it was retained by the vendee with an agreement that on the happening of the contingency, he, the vendee, would pay to the vendor an additional sum. Such a case as this has never arisen, and I do not consider it any stronger than as the case of a sale of an equitable estate, with a general warranty, which has not been supposed to deprive the vendee of the benefit attached to the character of a *bona fide* purchaser. I have examined all the facts and circumstances of this case with some care, and it does not strike me that there is any peculiar equity on either side, or any thing in it which can induce any person to view the cause with a good or evil eye. They have all shown themselves anxious to make an honest penny in an honest way, with this difference, however, of which the plaintiff has a just right to avail himself, that he has been vigilant and the others have slept on their rights. From the best consideration we have been able to give this case, we are of opinion that the court was wrong in the admission of the evidence as contained in the bill of exceptions, and in charging the jury " that as the plaintiff purchased only an equitable interest from one who never had any thing more than an equitable interest, a title imperfect on its face, he stood in no better situation than Derk from whom he bought. If the defendants establish the existence of a prior right by virtue of the sheriff's deed to Spees, that right will prevail, whether the plaintiff had notice of such right at the time he purchased or not. Notice is not necessary, as the recording acts do not affect the rights of either party. And in their instruction that it is sufficient if the jury are fully satisfied from the circumstances and facts in evidence, that there was an acknowledgment certified by the clerk of the court upon the deed. It is not necessary that the acknowledgment should be entered on the records of the court, nor is it necessary that the sheriff's deed to Spees should be recorded in the recorder's office. It is good without either of these acts, if duly executed and acknowledged in open court, and the acknowledgment is certified by the clerk on the deed itself."

This court are of opinion that the acknowledgment is a judicial act, and that a sheriff's deed must be acknowledged in open court to be valid against a *bona fide* purchaser without notice either actual or constructive. That parol evidence of the acknowledgment

[Bellas v. M'Carty.]

is inadmissible in a collateral proceeding, whether by witnesses present in court at the time of the acknowledgment, by witnesses who saw the entry of the acknowledgment on the deed, or by the production of the deed itself, with an acknowledgment on the back when no registry has been made of it in court. We say this cannot be in a *collateral proceeding*, although by the last case put, it would be competent for the court to amend the record by making a registry of the acknowledgment, though this would in no case be permitted without saving the rights of third persons.

We are further of opinion, that a *bona fide* purchaser of an estate, whether legal or equitable, without notice either actual or constructive, who has in due time recorded his deed, and in other respects pursued his claim with diligence, is to be preferred to a previous purchaser claiming under a sheriff's deed, the acknowledgment of which has never been registered.

KENNEDY, J. dissenting.—It is with great reluctance, and certainly not without some feeling of diffidence, that I undertake to express my dissent to the decision of some of the points which have been mentioned, as arising in this cause, in the very lucid and able opinion of the court, delivered by Mr Justice Rogers. Believing, however, that the rules of property will be materially affected thereby, and changed from what they have ever been considered as being, according to the plain meaning and spirit of the several legislative enactments, which have reference thereto, as also the various adjudications of this court in relation to the same, I feel myself constrained by a sense of duty, as long as I cannot yield my assent to the opinion of the court on the points alluded to, to declare my own, in regard to them, with some of the reasons, which appear, in my humble view, to be sufficient for its support. The first matter, in which I must beg leave to differ from the opinion of the majority of my brethren, is, as to the nature and character of the acknowledgment, directed by law to be made of a sheriff's deed, conveying lands sold by him under judicial process of the court, and the effect of the want of such acknowledgment under certain circumstances. From the first settlement of the state, even as a province, lands were held liable to the payment of the debts of their respective owners. By the 14th of the fundamental laws, agreed upon in England, the 25th of April 1682, between William Penn, governor and chief proprietary, then of Pennsylvania, and the freemen and planters of the said province, it was agreed, " That all lands and goods should be liable to pay debts, except where there is legal issue, and then all goods, and one-third of the lands only." *Miller's Prov. Laws, Appendix I.* And by the legislature of the province, at their meeting held at Chester or Upland, in the latter end of the same year, the liability of lands to pay debts, in cases of lawful issue, was extended to the one-half thereof, instead of one-third, where the lands were purchased before the debts were contracted. *Ibid. 4, sect.* 51. And in 1688, in further

explanation and alteration of the law on this subject, it was enacted, " Thall all lands whatsoever and houses should be liable to *sale upon judgment and execution* obtained against the defendant, his heirs, executors, or administrators, with this proviso, that the messuage and plantation, with its appurtenances, upon which the defendant was chiefly seated, might not be exposed to sale, till the expiration of one year after the judgment obtained, to the intent that the owner, or any one on his behalf, might endeavour the redemption of the same; and before such sale should be made, the appraisement thereof should be by twelve honest and discreet men of the neighbourhood; and that after such sale and appraisement as aforesaid, the lands should be and remain as a free and clear estate to the purchaser or creditor, his heirs and assigns for ever, as it was to the debtor." *Ibid.* 6. This appears to have been the first act which made all the lands of the debtor liable, in every instance, to the payment of his debts; and for this purpose directed that they, after being appraised, should be liable to be *sold upon judgment and execution,* which was never before directed expressly. Anterior to the passage of this act, the practice had been to take first one-half of the lands of the debtor, under a writ of *elegit,* issued upon the judgment for that purpose, and to deliver the same by metes and bounds to the creditor or plaintiff, at an appraised value thereof, made by twelve men, towards payment of his claim. Then after this, where the debt was contracted subsequently to the purchase of the land by the debtor, and the moiety thereof delivered to the plaintiff proved insufficient to satisfy it, a second writ of *elegit* was sued out, and the remaining moiety of the lands taken and delivered in like manner to the creditor, if the debtor happened to have no legal issue. The writs, thus issued and executed, were returned by the sheriff and filed in the prothonotary's office, whereby the creditor became invested with such right and title to the land as the debtor had, without any action or decision of the court thereon whatever. And the land being thus transferred, under the authority of judicial process, sued out of a court of record, was deemed such a conveyance thereof, as every person was bound to take notice of; so that no one thereafter could become a purchaser of it from the defendant, named in the process, without being affected with notice of the prior transfer made of it, as it were, by operation of law. This act of 1688 was limited in its duration to one year, and until twenty days after the rising of the next general assembly, but was continued in force by subsequent acts till 1695, when the legislature passed a new act in the same words, excepting that it was without limitation. *Miller's Laws, Appendix, p.* 10. The practice of the sheriff's selling lands, taken in execution by him, and of making deeds conveying the same to purchasers, seems to have commenced with the operation of the act of 1688, though nothing is mentioned therein of his making a deed of conveyance for the purpose of perfecting his sale of the land. The first act that we

have on the subject, expressly directing it, is that of 1700, whereby it is enacted, "That all lands and houses, within this government, shall be liable to sale, upon judgment and execution obtained against the defendant, the owner, his heirs, executors or administrators, where no sufficient personal estate is to be found; with this proviso, that the messuage and plantation, with its appurtenances, upon which the defendant is chiefly seated, shall not be exposed to sale before the expiration of one whole year after judgment is obtained, to the intent that the defendant, or any other on his behalf, may endeavour the redemption of the same; and before any such lands, messuages or houses, or any other lands or houses whatsoever, taken in execution, shall be sold, they shall be duly appraised by twelve honest and discreet men of the neighbourhood; and then it shall and may be lawful for the sheriff to make sale of, and *convey the same under his hand and seal;* after which sale and appraisement, made as aforesaid, such land and houses shall be and remain a free and clear estate to the purchaser or creditor, to whom the same are so made over or sold, his heirs and assigns for ever, as fully and amply as ever they were to the debtor." But still, notwithstanding the sheriff is here directed to make a deed perfecting the sale, yet he is neither required nor directed to acknowledge it in court or elsewhere. And, I presume, it will scarcely be denied, that the court, from which the process issued authorizing the sale, might have set it aside at that day as well as at the present, if any irregularity had been shown to have been committed by the sheriff in making it. The practice, however, mentioned above, of sheriff's making deeds confirming their sales of lands taken in execution, commenced under the act of 1688, and continued to prevail down to the passage of the act of 1700. And without any direction given, by any act to sheriffs to make deeds for such purpose, or to acknowledge them in court when executed, deeds were made and acknowledged by sheriffs in court, in some instances, and perhaps in the majority of cases where sales were made of lands taken in execution; but certainly not in all, as would appear from the records of the courts at that time. The practice of acknowledging the deeds at this early period by sheriffs, was possibly borrowed from the practice which had obtained previously of acknowledging private deeds conveying land, under the act of 1683, (*Miller's Laws, Appendix, pp.* 5, 6,) entitled, "Forms of grants of estates of inheritance for life, lives or years." By this act it was enacted, "that for avoiding long and tedious conveyances, and the many contentions which may arise about the variety of estates, all grants of estates shall be, either of the inheritance, or for life or lives, or for years, any number not exceeding fifty years, which grants shall be thus contracted in these words: "A B, the &c., day of &c., in the year (according to the English account) 16 &c., from him, and his heirs and assigns, grants his, (describe the bounds,) with all its appurtenances, lying in the county of ———, containing ———

X.—D

[Bellas v. M'Carty.]

acres, or thereabouts, to C D, and his heirs, (in fee,) or E F, for his life, (if for lives,) or to G H for one hundred years, if I K L M N O shall so long live, or to P Q for fifty years, for the consideration of —————— pounds in money paid, and of the yearly rent to be paid to A B, and his heirs and assigns, upon the &c., day of &c. In witness whereof he sets his hand and seal. Sealed and delivered in presence of R S T. Acknowledged in open court, and certified under the clerk's hand and *court* seal, the day of &c., 16 &c., and *registered* the &c., day of &c., 16 &c." It is perfectly clear, from the tenor of this act, that it did not embrace, and moreover that it was not intended to have any bearing whatever on sheriffs' deeds. The form of deed furnished by it could not be made to suit that of the sheriffs. And from the whole tenor and scope of it, it is difficult, if not impossible, to conceive that it was the design of the legislature to prohibit the use of other forms, previously in use, in making deeds of conveyance for purposes similar to those indicated by the act, and to render them void if they were not made in conformity to the form thereby given, and acknowledged and registered as thereby directed. This act, at most, can only be considered as directory, since it contains no prohibition as to using other forms in making deeds thereafter; nor declaration that they shall be void, if not acknowledged in court and registered, nor that they shall be of no force until so acknowledged and registered. Doubtless many deeds were made after the passage of this act, of a different form, without being either acknowledged or registered in court, which were nevertheless received and considered effectual and valid. And certainly much less could it be pretended that a sheriff's deed could be affected, or considered of no effect for want of such acknowledgment and registry: Because in no case was such a thing contemplated or directed by the legislature to be done, with a view to its being considered a judicial act by the court, in order to give it validity and efficacy thereafter. It was directed merely for the purpose of authenticating the execution of the deed so acknowledged and registered, that it might be rendered admissible in evidence thereafter, without making farther proof of its execution, according to the rule of the common law. That such acknowledgment, made at that early day, of a sheriff's deed in open court, was considered as being done merely for the purpose of having its execution authenticated, by a certificate of the clerk of the court, under his hand and the seal of the court, so that it might be recorded, in the recorder's office of the county, or the rolls office, either for preservation, or for being given in evidence at any time thereafter, if called for, without further or other proof being given of its execution, is evidenced in some degree by the practice which then prevailed of having them so recorded, as also by the form of the certificate given by the clerk of the court. In order to show what the certificate was like, I will here add a transcript, taken from two or three deeds of that day, which has been most kindly furnished by a friend. John White,

sheriff of the county of Philadelphia, in the province of Pennsylvania, having seized and taken in execution a house and lot of ground situate in the city of Philadelphia, under a writ of *fieri facias*, upon a judgment at the suit of Griffith Jones against Samuel Jobson, sold and by his deed conveyed the same to the plaintiff; and at the foot of the deed is a certificate, intended no doubt to be one, of the acknowledgment of its execution in the following terms. " Acknowledged in open court, held at Philadelphia, on the 7th first month 1693. Witness Wm. Markham, clerk, court and county seal," [L. S.] This deed appears to have been recorded afterwards on the 4th of the third month, in the same year, in the office for recording of deeds in the city and county of Philadelphia, in Book E 2, vol. v, p. 256. Also to a deed executed by John Claypole, sheriff of Philadelphia county, to Daniel Giffin, for a messuage and lot of land, taken in execution, and sold by the former as sheriff to the latter, is subjoined a certificate of acknowledgment in the following words: " Acknowledged in open court, held at Philadelphia the 7th day of December 1697, as witness my hand and *county* (not court) seal. John Claypole, sheriff, [L. S.]" This deed also appears to have been recorded the 15th of the first month, 1697-8, in the office for recording of deeds. Again, to a deed from Thomas Farmer, sheriff of Philadelphia county, to Jacob Reginer, for a lot of ground lying in the city of Philadelphia, is underwritten a certificate of acknowledgment, in the following words: " Acknowledged in the court of common pleas, at Philadelphia, the 9th September 1703, certified under my hand and county (not court) seal. Robt. C. Asheten." This last deed, it will be perceived, is certified by Robert C. Asheten, under his hand, without any indication of what he is, and under the county seal, as is also the one immediately preceding; and appears to have been recorded in the office for recording of deeds, on the 11th of the ninth month, in the following year, 1704. Now, if the acknowledgments of these deeds in the court had been considered or looked on as judicial acts of the court, can it be believed that they would not have been certified as such, in the usual form of certifying a record of the court—for instance, in the conclusion thereof: thus, " as appears by the records of the said court. Witness my hand and the seal of the said court. R. C. A. clerk." Thus this latter form, or one of similar import, would have been adopted and observed, had the acknowledgment been considered as judicial, I think can not well be doubted; but being viewed as a certificate merely of the fact, that the sheriff had appeared in court and acknowledged that the deed, which he produced and held in his hand, was his deed, a matter which required no action of the court, and with which the court certainly, at that day, never supposed it had any thing to do, unless the sale was objected to, on account of its having been unfairly or irregularly made; the object being to have the deed authenticated, so that it should carry evidence on it of its execution, it was deemed sufficient for the clerk of the court to certify the fact of the sheriff's

having acknowledged it in court, without more.    And here permit
me to say, that down to the present day this is the practice, and all
that is certified: and that such certificate of the acknowledgment of
the deed, subjoined thereto, has ever been received as satisfactory
evidence thereof, whether an entry of the acknowledgment was to be
found upon the records of the court or not.  Anterior to the passage
of the act of 1705, entitled " An Act for taking lands in execution
for payment of debts," 1 *Dall. Slat. Laws* 67; 1 *Smith* 57, no direc-
tion was contained in any act, that the sheriff should acknowledge
his deed in court or elsewhere, though it had been a common prac-
tice to do so: and that it was so, would  seem to be recognized in
that act, in the direction therein contained to " give the buyer a
deed; duly executed and *acknowledged in court,* for what is sold,
as *has heretofore been used,* upon the sale of lands."    But if the
acknowledgment usually made by a sheriff theretofore, of his deed
in court, upon his sale of land, was not considered, as I think I have
shown it was not, a judicial act, then certainly there is nothing in
this last act making it so.   But further, it seems to be admitted that
the practice of acknowledging sheriffs' deeds in court, for the sale of
lands, as there was no act of the legislature directing it, must have
commenced out of courtesy to the practice which obtained under
the act of 1683, recited above, giving a form for private deeds con-
veying lands, and directing them to be acknowledged in court and
registered.   But surely it will not be pretended, that an acknow-
ledgment made in court, under that act, of a private deed, by a grant-
or of his own land, could be construed into a judicial act, even by
the utmost stretch of ingenuity itself.  By that act, no power what-
ever is bestowed upon the court over the acknowledging of the
deeds thereby directed to be acknowledged in court; so that it is
utterly impossible, as it seems to me, to hold that acknowledgments
made under it were judicial acts, when the court had no power
whatever given to it to interfere with or control the acknowledgment
so directed to be made.   The court was completely passive in the
matter, excepting as to giving the certificate of its having been done
in court, which may perhaps be regarded as the act of the court,
but certainly not as one of a judicial character, requiring the exer-
cise of any discretion or judgment.   Seeing, then, that the practice
of acknowledging sheriffs' deeds in court is derived from the practice
that obtained previously, in regard to private deeds, under the act
of 1683, without any legislative direction, or requisition on the
subject, it is difficult, if not altogether impossible, to make the ac-
knowledgment of a sheriff's deed amount to more in its nature than
that of a private deed under the act of 1683, from which it was at
first borrowed.  Then, it being thus shown that the nature and effect
of acknowledging a sheriff's deed in court, before the act of 1705,
could not be deemed a judicial act, and as it is clear that that act
made no alteration or change whatever in its nature, but simply
directed it to be done " as had been theretofore used," it must still

[Bellas v. M'Carty.]

be considered the same, and nothing more than it was before the passage of that act. That act, in this respect, is clearly directory only, and does not declare the deed void or ineffectual, unless acknowledged in court: so that if the execution of the deed be established, by proof made according to the rule of the common law, and no valid objection can be made to the sale, it ought to be considered valid and available; and especially where the purchaser at sheriff's sale, or party claiming under him, is in the possession of the land, as in this case; and the sheriff dead, who executed the deed, so that he can not be had to acknowledge it in court. But further, every subsequent act of the legislature, relating to the acknowledgment of sheriffs' deeds, until after the deed in question was executed, goes to show very clearly that the acknowledgment, though directed to be made in court, was not considered a judicial act, nor as requiring the exercise of any discretion and judgment of the court in regard to it. Under the act of 1705, it was ever considered that the deed of the sheriff was thereby directed to be acknowledged in the court, from which the process authorizing the sale of the land issued. M'Cormick *v.* Mason, 1 *Serg. & Rawle* 99, 101; Thompson *v.* Phillips, 1 *Bald.* 272. And that is the court also to which the sheriff, by the terms of the process, is required to make return of the same, and what he has done thereon. This is so even in *testatum* executions. And it may be that this has given rise to a notion entertained by some of the profession, and also by some judges, that the acknowledgment of the deed in court is necessary to show that there has been a confirmation or approval of the sale on the part of the court, in order to make it valid and effectual; and, therefore, must be held to be a judicial act. But this is clearly a misapprehension of the matter; for under the eleventh section of the act of the 13th of April 1791, 3 *Dall. Laws* 95; 3 *Smith* 31, entitled " An Act to establish the judical courts of this commonwealth," &c., the sheriff, when he sells land by virtue of a *testatum* execution, is authorized expressly to acknowledge his deed, perfecting the sale, in the court of common pleas of the county wherein the sale is made, and the land lies, and yet, until the passage of the act of the 16th of June 1836, this court, in which the deed is thus directed to be acknowledged, by the act of 1791, never had any power over the sale whatever; it could neither affirm nor set it aside, but was authorized by the act of 1791 barely to take the acknowledgment of the deed, and to certify it, which demonstrates that such acknowledgment could not have been deemed a judicial act, as is alleged. Before the act of 1836 came into operation, the court alone, from which the *testatum* process issued, in case of a sale of land being irregularly made under it, had the power to set such sale aside, so that the deed might have been acknowledged in the court of the county, wherein the sale was made, which, according to the express terms of the act of 1791, shall be as valid and effectual, as if acknowledged in the court of the county from which the process issued; and yet this latter court

X.—D*

might have set the sale aside, after the deed had been acknowledged in the former; which shows that the acknowledgment of the deed could not be considered as a judicial confirmation of the sale. It can not be supposed that the provision of the act of 1791 arose from any want of advertence or proper apprehension on the part of the legislature as to the real nature and design of the acknowledgment, because being, as the legislature rightly considered it, and intended it should be, a mere authentication of the execution of the deed by the sheriff, and not a judicial confirmation of the sale, further than it was regular and duly made, it was authorized to be done in the county where the sale was made, in order to meet the convenience of the sheriff and save expense to the parties, by rendering it unnecessary for him to go to, possibly, the extreme end of the state for the purpose of acknowledging the deed in the court whence the process issued. It would also seem that, whenever the legislature deemed it requisite that the judicial interposition of the court should be had for the purpose of perfecting a sheriff's sale, as in the case of a sheriff dying or going out of office, after having made a sale of land, but without having executed a deed to the purchaser, they have required that the court, from which the process issued, upon application, shall *examine* the matter, and thereupon make *an order*, authorizing the sheriff for the time to make a deed perfecting the sale of his predecessor, which order when made shall be *entered on the records of the court*. Section second of the act of the 23d of March 1764, 1 *Dall. Laws* 440; 1 *Smith* 263. Thus it would appear, when they intended that any thing should be entered on the records of the court in regard to a sheriff's deed, they expressly directed that it should be so, in order to render it available. But no entry of the sheriff's deed, or the acknowledgment of it by the sheriff, is directed, either by the act of 1700 or 1705, to be made on the records of the court. So it would seem to be fairly inferrible from other acts on the subject of selling lands for paying the debts of the owners thereof, that if the legislature had intended that every sale, made by a sheriff, of land taken in execution, should be *approved* of first by the court, before it should be considered valid, they would have said so in express terms; for they did so in the law of 1693, *Miller's Law, Appendix* 9, entitled, " The Law about Testate and Intestates," by enacting, " that all real estates and lands, tenements and hereditaments, and all personal estates which any person hath in this province, at the time of his decease, shall be liable, either by conveyance or bill of sale, duly executed by the lawful executor or administrator of such deceased, and *approved* and acknowledged in open court, according to law, or by judgment and order of the respective courts of record, upon due procedure therein had, to be seized and sold for payment of the decedent's just debts, so far as the same estate shall extend in due order of law." But again, can it be supposed that if the law had been such in 1764, when the legislature acted upon this subject, as

[Bellas v. M'Carty.]

that a sheriff's sale of land, taken in execution, could not be holden good until it was either *expressly approved* by the court from which the process issued, or at least was impliedly so; as is contended here, it must be by an acknowledgment of the deed, and an entry thereof made on the records of the court, that they would not have provided also for the case of a sheriff's dying after he had made a sale and deed perfecting the same, but without having acknowledged it in court, by authorizing the court to make an order, directing the sheriff for the time being in office, to execute and acknowledge a new deed; but this, in their view was unnecessary, and could only have been so for one reason, which is, that a deed made by a sheriff, who died or went out of office, without having acknowledged it, was good and effectual without it.     Adams *v.* Thomas, 6 *Binn.* 254; Woods *v.* Lane, 2 *Serg. & Rawle* 53.   And indeed never was there any act passed authorizing the court to make an order of any kind in such case, until 1836, when, by the act of the 16th of June in that year, the courts, perhaps, would seem to have that authority given them.     This, most probably, was thought advisable on account of the conflicting opinions, which seemed to be growing up in regard to the necessity or expediency of it.     Supposing then the sale, in such case, to have been regularly made, before the act of 1836, under judicial process; and the purchaser to have paid the purchase-money to the sheriff, which he was bound to do immediately upon the land being struck down to him, Scott *v.* Greenough, 7 *Serg. & Rawle* 199, Negley *v.* Stewart, 10 *Serg. & Rawle* 207, and the sheriff to have paid it over to the lien creditors, who were entitled thereto, and after having executed a deed to the purchaser of the land, to have died without acknowledging it in court, what was the purchaser to do for want of his deed not having been so acknowledged?   Will it be said, or can it be, that under the then existing state of the law, he could not have recovered the possession of the land from the defendant, as whose property it was held? notwithstanding the purchaser had paid the purchase-money, and the defendant had received the full benefit of it in the payment of his debts?   If the purchaser could not have recovered the land, it is very clear that he could not have recovered back his money, because it had gone into the pockets of those who were justly entitled to receive it.   Neither could he have proceeded so as to have the land sold a second time, because, as long as the first sale stood, no process could be issued authorizing a second; but the first being perfectly regular, the court could not interpose and set it aside.   If the law was so, the situation of the purchaser in such case, must be most deplorable indeed.   He was induced, upon the faith of the law that he would get the land, to part with his money, but it seems that through the visitation of God, in removing the sheriff from existence, the law was unable to do this; and hence, without any default whatever upon his part, he is so

fixed that he can neither get the land nor his money back again. He is placed so, that he can neither move forwards nor backwards, up nor down. It is almost impossible to believe, that the law ever could have been such as to have worked such flagrant and outrageous injustice. But even if it be, that the acknowledgment by the sheriff of his deed in court, were only required in order to show at all times thereafter, that the court in permitting him to do so, had *approved* of the sale, and therefore it was to be regarded as valid, why, in case of the sheriff's death, when his appearance in court for this purpose has become impossible, could not the court on the trial of the ejectment, either brought by the purchaser to recover the possession of the land, or against him, if he has peaceably and fairly obtained it, examine into the regularity of the sale, and after having heard all that can be adduced for and against it, pronounce it either good or bad, according to what shall have been shown? Under any possible view, as it appears to me, that can be taken of the act of 1705, more than this, at the very utmost could not be required; but clearly the most rational construction of it is, that it is directory only, so far as regards the acknowledgment of the deed by the sheriff, and the want thereof does not therefore render the deed ineffectual. And such was the view which the court took of it in Moorhead *v.* Pearce, 2 *Yeates* 256, where the deed had never been acknowledged in court by the sheriff, but the execution of it by him proved on the trial of the cause, by one of the subscribing witnesses thereto. So in Duncan *v.* Robeson, 2 *Yeates* 454, a deed acknowledged in court by the sheriff, as such, some twenty-five or six years after he was out of office, and four after the plaintiff, who claimed under it, had commenced his action, was received in evidence, on the ground that the acknowledgment of the deed was sufficient evidence of its execution, and nothing more; because the defendant was allowed to show, if he could, that the sale was not made according to the requirements of the law. As to this, the court said, " the defendant is at liberty to go into every objection against the sale, which might have been made, if the deed was now offered for acknowledgment, as in common cases." See also Stroeble *v.* Smith, 8 *Watts* 280, where the act of 1836, which is much more particular and apparently preremptory in its direction for the acknowledgment of sheriff's deeds, was held to be directory only in relation thereto. And in the late case of Steever *v.* Rice, 3 *Whart.* 21, it was held, that a purchaser of a messuage and lot of ground, situate in the city of Philadelphia, sold by the sheriff to him, under a writ of *levari facias*, issued upon a judgment obtained in a *scire facias* on a mortgage, wherein the purchaser was the mortgagee, and the money arising from the sale coming to him, acquired such a right and interest by his purchase in the property, of which he had taken the possession, without even having obtained a deed from the sheriff, as would enable him to defend against a subsequent purchaser, who had got a deed duly

[Bellas v. M'Carty.]

acknowledged in court, upon a sale made by the sheriff of the same property under an execution, sued out upon a judgment, at the suit of another person against the mortgagor.   This was certainly going much further than the court below went in this case, for it was protecting the defendant in the possession of his purchase, without his having any deed at all; but here the defendant had a deed founded upon a sale, to which no objection has been made.   That a purchaser at sheriff's sale, of land, acquires an interest thereby, before he obtains a deed from the sheriff for it, has been settled and recognized in several cases.   In Morrison *v.* Wurtz, 7 *Watts* 437, it was ruled, that a purchaser at sheriff's sale of land, before he obtained a deed for it from the sheriff acknowledged in court, had an inceptive interest therein by the contract, which would become bound by a judgment entered against him, at any time after the land was struck down to him.   And in Hartman *v.* Stohl, 2 *Penn. Rep.* 231–2, this principle is still carried further.   There it is laid down by Mr Justice Rogers, that by payment of a large portion, such, for instance, as three-fourths of the purchase-money, and the delivery of the possession, the sheriff's vendee of land acquires an interest therein, which, although it may not amount to a legal title, is such as may be taken in execution and sold, and that the purchaser thereof may recover the possession from one who shows no title.

Then as to the manner in which sheriffs usually acknowledged their deeds before the act of 1836; there was certainly nothing therein which would have led any one to believe, or even to suspect, that the court, in giving their attention to the sheriff while he acknowledged his deeds, were pronouncing a judgment, approving and confirming the sales mentioned therein.   In the courts held in and for the city and county of Philadelphia, from the time of the earliest recollection of the oldest gentleman of the bar there, the practice of the sheriff, until the act of 1836 came into operation, was to appear in court, with all the deeds in his hand, which he had to execute for sales of lands, made under writs returnable to that or any preceding term, and even in the midst of the trial of a cause by a jury, or other business going on in the court, to watch the presiding judge of the court until he caught his eye, and then to raise his hand, in which he held his deeds, repeating, " I acknowledge the deeds which I now hold in my hand," or other words of similar import, without attempting to designate them by any thing whatever contained within them: and then hand them over immediately to the clerk of the court, who without a word being uttered by the court, made a brief memorandum generally of the acknowledgment from which he was enabled afterwards, when he could attend to it, to make a certificate of the fact at the foot, or on some part of the deed itself, under his hand and the seal of the court, pretty much in the form of those previously given.   And instances have occurred, and it is believed not a few, of deeds being

taken from the clerk's office, after being acknowledged in the man-
ner mentioned, without any such certificate being entered upon
them, or entry of the acknowledgment made on the records of the
court, or registry of the deed itself.  Now to pronounce such a pro-
cedure a solemn adjudication of the court, approving and confirm-
ing the various sales mentioned in the several deeds so acknow-
ledged, without the court's knowing or being informed what they
were, or even attempting to make the inquiry, would seem to be,
as it appears to me, any thing but a judicial act of the court. , In
truth it seems to be even worse than mockery to call it so.   We
have cases, however, in which it must be admitted, that the ac-
knowledgment of the deed by the sheriff in open court has been
spoken of as an indispensable requisite or judgment of the court, in
order to give the deed validity, but certainly in no case does it
appear to have been decided, that a sheriff's deed, founded upon a
sale of land made by him under proper authority, and in due con-
formity to every requirement of the law, could *not* avail the pur-
chaser or give him title to the land, without its being acknowledged
in court, when the death of the sheriff, as is admitted to be the fact
in this case, has rendered this impracticable.   The reason given
by Chief Justice M'Kean in Shrider's Lessee *v.* Nargan, 1 *Dall.*
68–9; for its being unnecessary to have a sheriff's deed " re-
corded in the rolls' office according to the act of assembly of 1774,"
as it is mentioned in the book, but I take it as it must have been
meant, " in the office of the county for recording deeds, according
to the act of 1775."   It was there objected that a sheriff's deed, not
recorded, could not be read in evidence.  " *Sed non allocatur,*
because it was (as is said) acknowledged in court, and the register-
ing of it in the prothonotary's office (as is always done) is a suffi-
cient recording within the act."   It was also ruled in that case,
that *every* deed under seal, when *proved,* might be read in evidence.
Surely this would apply to a sheriff's deed as well as that of any
other person, and support the reading of the sheriff's deed in evi-
dence, as was done in this case, in the court below, because it was
*proved* to have been executed by the sheriff before it was read in
evidence, and was directly pertinent to the issue in this cause, which
seems to be a qualification that ought to have been annexed to this
broad rule, as laid down by the court in that case, according to
what is said in the cases of Peters *v.* Condron, 2 *Serg. & Rawle* 84,
and Faulkner *v.* Eddy, 1 *Binn.* 188.   The decision of the court on
the first point in Shrider *v.* Nargan, was correct enough, that is, in
admitting the sheriff's deed to be read in evidence, though it was
not recorded in conformity to the act of 1775.   But the reason as-
signed for it was clearly erroneous.   The reason assigned does not
meet, what would appear to have been one of the chief objects
which the legislature had in view in passing the act of 1775, which
was that of causing every deed, passing or affecting the title to
lands, to be recorded in the office, established within the county for

the recording of deeds, where the lands were situated. Now, admitting that it was the practice, in every case of a sheriff's deed, for the sheriff to acknowledge it in court, and for the prothonotary to make a record of the acknowledgment and a registry of the deed; still before the passage of the act of the 13th of April, 1791, this could only be done in the court of the county, from which the process authorizing the sale issued. So that there could and was not any record made of the acknowledgment of the deed, or registry of the deed itself, in the county where the lands were situate, when sold under *testatum* process, which was frequently the case. This, if done at all, could only be done legally in the court of the county from which the *testatum* process issued. Hence it was evidently incorrect to say, that the acknowledgment of a sheriff's deed, founded upon a sale of land made under *testatum* process, was a sufficient recording within the act of 1775: it can not be likened in any respect to a recording of the deed in the county where the land lies. The reason therefore assigned by the court, for their decision on the first point in Shrider *v.* Nargan, may be regarded as given hastily, and looked on as a slip in the hurry of business, as Chief Justice Tilghman said, in 2 *Serg. & Rawle* 83, their decision on the second point has been considered. The decision itself, however, was right enough, but the reason given in support of it is wrong. The court, as it appears to me, ought to have said, that the deed being a sheriff's deed, conveying land, regularly taken in execution and sold by him, did not come within either the letter or spirit of the recording act of 1775, or of any other recording act. It being a sale founded upon a judgment had in a court of record, and made *publicly* by an officer of the law under and by virtue of judicial process, sued out and directed to him for that purpose, it was deemed by the legislature unnecessary to require that it should be recorded in the office for recording deeds in the county where the land lay, within six months after the execution thereof, or within any other period, otherwise the deed should " be adjudged fraudulent and void as against any subsequent purchaser or mortgagee, for valuable consideration," which are the words of the recording act. It will scarcely be denied, I think, that previously to the act of the first of April, 1823, every person would have been bound, at his peril, to have taken notice of a seizure of land under a *testatum fieri facias,* and condemnation of it to sale, as also of a subsequent sale thereof under a *testatum venditioni exponas,* though no entry should have been made of such *testatum fieri facias* on the records of the court, in which the land was situate, nor deed acknowledged by the sheriff therein, within six months after the return day of the writ of *venditioni exponas,* under which the sale was made, in imitation of the six months allowed for recording of private deeds under the recording act of 1775. Indeed it frequently happened after the passage of the act of the 20th of March, 1799, enabling the justices of the supreme court to hold circuit courts in the several

counties of the state, as often as causes should be removed into the same, and be at issue, that deeds of sheriffs' grounded upon sales made under *testatum* process from the supreme court or some of the circuit courts, were not acknowledged for a year or two, or even longer in some instances after the sales, on account of no circuit court being held in the county where the lands lay, in which the sheriff, by the express terms of that act, was authorized to acknowledge his deeds executed upon such sales; yet no man ever supposed that, during such interim, if any person purchased the land of the defendant in the execution, though *bona fide,* for a valuable consideration, and without actual notice of the sheriff's seizure and sale, he could hold it against the purchaser at the sheriff's sale. Judicial sales are not only founded upon the judgments and decrees of courts of record, of which every one is bound to take notice, but made publicly in pursuance of process issued thereon, after actual notice given to the party, as whose estate the land is about to be sold, and to the public, by advertising them in the newspapers published within the county, and by means of handbills set up in different parts thereof, some three weeks previously, of the time and place, when and where the sale shall be made. Public convenience, as also public policy, therefore requires, that all shall be held bound to take notice of judicial sales or transfers of real estate. Such also is the law as to personal estate, so that there need be no actual and visible change in regard to the possession of it, corresponding to the transfer made thereof by the sale, as there must be when private sales are made of it. Accordingly in Myers *v.* Harvey, 2 *Penn. Rep.* 478, it was held that the purchaser of personal property at sheriff's sale, was protected in his right, which he thereby acquired to the same, against the claims of the creditors of the debtor against it while it remained in the possession of the debtor under a lease from the purchaser. So for the same reason lands taken in execution and delivered to a judgment creditor, upon a writ of *liberari facias,* in satisfaction of his judgment, is such a transfer of the right to the possession thereof, as every one is bound to notice; and should any person subsequently buy the land of the defendant in the judgment, he will be affected with notice, whether he had actual notice of the previous transfer under the judicial process or not. So every one is bound to take notice of the assignment, which an insolvent debtor is required by law, to make of his property and effects, before he can obtain the relief that is provided for him in such case. Accordingly in Ruby *v.* Glenn, 5 *Watts* 77, it was held, that the recording acts did not apply to such assignments; and that a sale therefore, by the insolvent after he obtained his discharge, of lands lying in a county distant from that in which he got his discharge, was invalid, though the purchaser *bona fide* paid a valuable consideration therefor, without any actual notice of the discharge or of the assignment. And previously in the case of Wickersham *v.* Nicholson, 14 *Serg. & Rawle* 118, it was held that

the property of an insolvent debtor passed to his trustee immediately on his assignment, and that *all the world was bound to take notice of it;* and that on payment, therefore, to the insolvent afterwards, of a debt owing to him, which was embraced in the assignment, by one who had no notice in fact of his creditor's discharge under the insolvent laws, was not good. So the real estate of an intestate may be passed by a decree of the orphans' court of the county in which it lies, to one of the heirs, when it cannot be divided among them, without impairing the value thereof, though there be any number of them interested in it as owners by descent. The transfer is effected by a decree of the court, founded upon a proceeding had therein, of which every body is presumed to be conusant: and hence should any person thereafter purchase of one or more of the heirs, whose interests in the estate have been so transferred, he will be affected with notice, though in point of fact he had none. Or where no one or more of the heirs will agree to take the estate at the appraisement made thereof, under the writ awarded by the court for that purchase, the court may, at the instance of any one of the heirs, make an order directing the administrators of the intestate to sell the estate by auction, after public notice given of the time and place appointed for that purpose; which when done the purchaser receives a deed of conveyance from the administrators, and thus becomes invested with the title to the estate, without the deed's being acknowledged in court; and of such sale every one will be held bound to take notice, without any registry or record of the deed being made, because it is made under and in pursuance of a decree of the court. These cases all go to show most clearly the total insufficiency, as also inaptitude of the reason given by Chief Justice M'Kean in Shrider *v.* Nargan, for its being unnecessary to have a sheriff's deed recorded in the recorder's office, established for recording deeds; and that the registry of such deed, in order to render it valid or effectual, could never have been considered necessary by the legislature. And under this conviction, resting at all times upon their minds, no act was ever passed requiring it either expressly or impliedly to be done; or declaring if it were not, that the sale or the deed should be void in any case whatever. The direction given in the act of 1705, for the acknowledgment of the deed, is the only thing, from which it is attempted to draw any conclusion of the kind; but I conceive, I have shown, that the act in that particular, is at most only to be considered as directory, and not as avoiding or rendering either the sale or the deed ineffectual for want of the acknowledgment. And again from the various acts of the legislature on the subject, that it never was designed that the acknowledgment itself should be considered a judicial act. But if the acknowledgment, in court, of a sheriff's deed be held indispensably necessary to entitle it to be read in evidence, and that such acknowledgment can only be made to appear by a record thereof,

X.—E

[Bellas v. M'Carty.]

made in the court in which it has been acknowledged, then, I would ask, is it not practicable to have all this supplied? Yet in the present case, under the provisions contained in the act of the 16th of June, 1836, entitled, " An act relating to executors," the only formidable objection to this being done, seems to arise from this act being entirely prospective in its terms, and therefore not applicable to cases which occurred before its passage, as this case did. The 102d section of the act, *Pamph. L.* 780, provides for the case of a sheriff's dying after he has made a sale of land, without having executed and *acknowledged* a deed therefor, by authorizing the supreme court, or the court in which the judgment was obtained, under which the sale was effected, upon the petition of the plaintiff in such judgment, or the purchaser of the land, to make an order to be entered upon their records, directing the sheriff for the time being, to execute a deed. But seeing the sale in this case was made before the passage of this act, I confess, that I am inclined to believe, that it can not be brought within its provision. If the language of the act were such, as to include and provide for cases happening before as well as after its passage, I do not consider that the length of time, which has elapsed here, since the sheriff made the sale and executed the deed, would be any objection whatever to the want of the record of the acknowledgment being supplied now. In M'Cormack *v.* Meason, it was done before the second trial came on, under the *venire facias de novo,* which was awarded by this court, upon their reversal of the judgment rendered on the first trial of the cause in the court below, which was twenty-six or seven years after the deed had been executed by the sheriff; and the defect being thus supplied, the defendant succeeded again on the second trial in obtaining a verdict and judgment in his favor, which terminated the contest. And in Duncan *v.* Robeson, 2 *Yeates* 454, the acknowledgment of the deed was wanting until the eve of the coming on of the trial of the cause, when it was supplied by getting the person, who had been sheriff when he executed the deed, to come into court and acknowledge it, upwards of twenty-seven years after it had been executed. As long as the person who had been sheriff, when he executed the deed, was in being, it was well enough to have the deed acknowledged by him in court, but where his death has rendered that impracticable, proof made according to the rule of the common law, of the execution of the deed by him, as sheriff, when he was fully authorized to do so, ought to be considered sufficient, as I think I have already shown, to enable the party claiming under it to read it in evidence.

The next point passed on by the opinion of the court, in this case, from which I must beg leave to differ is, that Mr Bellas, the plaintiff, is to be regarded, from the evidence, as a *bona fide* purchaser, for a valuable consideration without notice. In the first place, it is sufficient to observe that I have shown most clearly, that all the world is bound to take notice of a sheriff's sale, and that

[Bellas v. M'Carty.]

consequently Mr Bellas, being thus affected with notice, can not be considered such a purchaser.

But in the next place, even if it were otherwise, he could only, according to the principle settled in regard to this point by this court, in Youst *v.* Martin, 3 *Serg. & Rawle* 423, claim the land in question as a security for what he has actually paid of the consideration money mentioned in the deed made to him: 300 dollars is the consideration mentioned therein, and it was agreed in writing, that this sum should be all paid, provided Mr Bellas should be able to hold the land under his purchase; 50 only of it, however, have been paid. Thus it appears by the written agreement of the parties, that only one-sixth part of the consideration money, mentioned in the deed, was paid; but it is said that the 50 dollars, which were paid by Mr Bellas, before it is shown that he had actual notice of the sheriff's sale, under which the defendants claim, was in fact all the consideration money that was to be paid absolutely; and that the remaining 250 dollars of the 300 mentioned as the consideration in the deed of conveyance, were only to be paid on a future contingency; but then that contingency must be regarded as the first and great object of the purchase by Mr Bellas, which is, that he should forever continue to hold the land under the conveyance made of it to him. And if he did, can it be denied that the remaining 250 dollars were not only a part, but almost the whole and only consideration that he was to pay for what he wished to obtain. And certainly nothing can be clearer than that the party, George Derk, of whom Mr Bellas purchased by means of his agent, Christian Bower, would not have sold or parted with his right absolutely for the 50 dollars without more. And I must say further, that it does seem to me unaccountable that he should have agreed to sell his right even for 300 dollars, when he had George Dunkelberger, a responsible man, bound to pay him nearly 800 dollars for it beyond 100 received. It is said Derk found himself unable to make to Dunkelberger a title, such as he had agreed to make for the land, and therefore could not enforce the execution of the agreement against Dunkelberger; but it would seem from the evidence to have been otherwise. The legal title to the land then was in Col. Johnson, or his heirs, from whom Derk derived his claim to it, and who, it seems, were willing to make the title to Derk or any other, who could show himself entitled to it, as the assignee of Abraham Cherry, to whom Col. Johnson, by his written agreement, had agreed to convey the land upon being paid the consideration money therein mentioned. And it is certain that the representatives of Col. Johnson did convey the land afterwards, upon being applied to to do so, and receiving 81 dollars, which they claimed as a balance of the purchase-money coming from Abraham Cherry upon his agreement for the purchase of the land. It is not easy, therefore, to say why Derk sold the land to Mr Bellas upon the terms that he did, unless the sheriff's sale of the land,

under which the defendants claim it, is brought into view. Be that, however, as it may, Mr Bellas could not be considered, according to the English doctrine, a purchaser *bona fide* for a valuable consideration without notice, unless he had received a deed of conveyance for the land, and paid the whole of the consideration money mentioned therein, before he received notice of the claim adverse to his purchase. This rule appears to be established fully by the following cases, which show, also, that an execution and delivery of the deed of conveyance to the purchaser, and security given by him for the payment of the purchase-money, will not constitute here such a purchaser; nothing short of an actual payment of the whole of it will answer this purpose. Tourville *v.* Naish, 3 *P. Wms.* 307; Story *v.* Lord Windsor, 2 *Atk.* 630; Hardingham *v.* Nicholson, 3 *Atk.* 304; Moore *v.* Mayhone, 1 *Ch. Ca.* 34; 2 *Freem.* 175, *pl.* 235; Jones *v.* Stanley, 2 *Eq. Ca. Ab.* 685, *pl. 9*; Hoover *v.* Donnelly, 3 *Hen. & Mund.* 316; Wigg *v.* Wigg, 1 *Atk.* 284; Wilcox *v.* Gallaway, 1 *Wash. Rep.* 41. *Sug. on Vend.* 274, where the rule on this subject is laid down as above, and the cases referred to which go to support it fully. It is true, however, that in England, inadequacy of price has been ruled to be no objection to a purchaser without notice, being considered *bona fide*, unless the consideration be such as would be deemed fraudulent under the statute of 27 *Eliz.;* because, say the chancellors, it would be turning a purchase into a *security*, which is not warranted by any decree to be found. Bullock *v.* Sadlier, *Amb.* 766; Basset *v.* Nasworthy, *Finch. Rep.* 103, cited *Amb.* 766; Mildmay *v.* Mildmay, cited *Amb.* 767. But in this respect we have departed from the chancery rule in England, and adopted a different one, as settled first in Youst *v.* Martin, 3 *Serg. & Rawle* 423, and followed since that in subsequent cases. This court there, after reviewing the English cases, held that a subsequent purchaser, who had paid a portion of the purchase-money before notice of the plaintiff's claim, was entitled to hold the land as a *security* for the repayment of the money so paid by him on the purchase of the land. The justice and equity of this principle is so obvious, that it appears to me it cannot be objected to on any rational ground; and it is somewhat surprising that it was not at first adopted by the courts of chancery in England, which would seem to be the chief, if not the only reason why it was not acted upon afterwards. Bullock *v.* Sadlier, *Amb* 766. If the operation of this rule, as established in Pennsylvania, were to be held to be evaded by such an agreement for the purchase of the land, and the payment of so small a portion of the consideration money mentioned in the deed, as was made and paid in this case, it would tend greatly to encourage speculations, oftentimes of a very unfair and fraudulent character, in buying and selling lands. Because no man who has a defective, or perhaps no title at all to land, though he may think his title is good, and be willing to warrant it as such, for a certain price to be paid by in-

[*Bellas v. M'Carty.*]

stalments, at subsequent and different periods, will object to selling and conveying it, if he can be assured that his price will be paid him at such subsequent periods, notwithstanding it should be upon condition that the purchaser continues to hold the land. But if the vendor in such case entertains any doubt of the goodness of his title, he would of course be particularly solicitous to adopt that mode of selling it, as it would tend to improve, if not make his title perfect, and therefore enhance the price which he might obtain for it; indeed it is manifest, that by such a *manœuvre,* he would be likely to obtain a much larger price than he could do by stipulating for whatever sum it was agreed should be paid, that it should be paid absolutely, though it be made payable in instalments. And as to the purchaser, it is also equally obvious, that he would be more likely to obtain his object by making his contract in that way; because if he be ignorant of what does exist against the title he is about to buy, which will be removed by his purchasing without notice in fact of it, it is securing to him at once, by the payment of a very small sum of money, not more than one-sixth part of the price, the object of his purchase forever. But supposing him to be conusant of the defect, the stipulation cannot operate against, but may operate in his favour, and therefore he will not object to it. Such a device, I apprehend, would not be permitted to avail even in England, according to the rule established there, because the money to be paid conditionally cannot be considered any thing else than part of the purchase or consideration money, and without payment of the *whole* of that before notice, the purchaser will be affected with notice in the same manner as if he had paid no part of it whatever. But here such a contrivance cannot be countenanced, without a most palpable subversion of the rule as laid down and established in Youst *v.* Martin. Agreeably to that rule, the most that the plaintiff here could claim, would be to recover the land only as a *security* for being reimbursed the 50 dollars, with interest thereon from the time he paid it.

I concur fully in the opinion expressed by the court, provided Mr Bellas could be considered a purchaser without notice, that the mere circumstance of his having bought an equitable claim or title to the land, would not preclude him from claiming the benefit of the rule, because an equitable estate comes within the language and design of the recording acts, as fully as a legal estate. The injury to the purchaser might be the same in either case, if he were to lose the object of his purchase. Equitable estates are embraced by the statute against frauds and perjuries; and are as much the subjects of transfer as legal estates, and therefore the purchasers of them are entitled to the same rule of protection; unless where it appears on the face of the title to the equitable estate, that there is a legal title to which it may be subservient, as would seem to have been the case here in regard to the legal title, which was invested in the heirs of Col. Francis Johnson, when the plaintiff purchased

X.—E*

·the equitable interest derived from that source, by means of an agreement made with Col. Johnson, in his lifetime, by Abraham Cherry, for the purchase of the legal estate in the land.   In equity, the court will consider an equitable purchase as a legal purchase. Nosworthy's case, cited in Bullock *v.* Sadlier, *Amb.* 767.   And so it has been ruled, that although a purchaser has notice of an equitable claim, by which his conscience is affected, yet a person purchasing of him *bona fide,* and without notice of the right, will not be bound by it.    Ferrars *v.* Cherry, 2 *Vern.*; Merlins *v.* Joliffe, *Amb.* 313; Demerest *v.* Wincoop, 3 *Johns. Ch. Rep.* 147; *Sugd. Vend.* 274; so on the other hand, a person with notice of an equitable claim, may safely buy of a person who purchased *bona fide* and without notice of it.    Harrison *v.* Forth, *Pre. Chan.* 51; 1 *Eq. Ca. Abr.* 331, *pl.* 6; Brondling *v.* Ord, 1 *Atk.* 571; Sweet *v.* Southcote, 2 *Bro. C. C.* 66; *Dick.* 671; Louther *v.* Carlton, 2 *Atk.* 242; Andrew *v.* Wrigley, 4 *Bro. C. C.* 125, 136; because, if a different rule were to prevail,· such purchaser, though his right be good, might not be able to sell the estate.

I have only to add now in conclusion, if it be that a balance of the purchase-money, which Abraham Cherry agreed to pay Col. Johnson, in his lifetime, for the land, still remained unpaid at the time the plaintiff purchased; and was paid afterwards by M'Carty, one of the defendants, who, in consideration thereof, obtained an investiture of the legal title, the plaintiff under no circumstances can recover the land until he pays this balance, whatever it may be. Eighty-one dollars appears to be the sum, which M'Carty paid, that was claimed as such balance; if this be correct, then Mr Bellas would have to pay this sum, with interest thereon, from the time it was paid by Mr M'Carty.    Both plaintiff and defendant bought subject to this balance, if it was really due; and therefore neither can claim to hold the land without paying it, if he has not already done so.

Huston, J. dissented also on the same grounds.
Judgment reversed, and a *venire facias de novo* awarded. ·