Adams *v.* Soule et al.

---

RILEY M. ADAMS *v.* JAMES M. SOULE AND ——— PUTNAM.

## (IN CHANCERY.)

*Chancery. Fraud. Notice. Promissory Note. Vendor and Purchaser. Evidence.*

After a court of chancery has referred certain issues to a court of law for trial by jury, and the jury have decided some of them and been unable to agree upon others, the cause may then be decided by the court of chancery upon the whole record, including the report of the trial at law, provided such court finds itself able to dispose of the cause satisfactorily upon all the evidence before it.

The orator's testimony on the trial at law may be considered by the court of chancery in determining the case, notwithstanding he did not testify before the case was referred to the jury.

If the owner of a lease employs another to greatly exaggerate its value to the landlord, and to agree to purchase the whole property of him at more than its value, if he would buy the lease from the owner, for the purpose of defrauding the landlord into a purchase of the lease, such exaggerated statements of its value cannot be excused as mere " puffing," such as a vendor is allowed to make use of. Neither does the readiness at which the landlord caught at the bait, though he knew the price, at which the other party proposed to purchase, was too high, excuse the fraud on the part of the confederates

A. owned property subject to a lease to S. S. secretly confederated with and employed R. to represent to A., that the property was of great value, and that he would purchase it at much more than its real worth, if A. would buy up the lease of S. Influenced by this fraud, A. purchased of S. the lease at an exorbitant price, immediately after which R. absconded without purchasing the property. A. paid S. for the lease in two notes, one of which S. sold to P., who bought it in good faith and without any knowledge of any defence to it, and paid therefor partly in money and partly in his own note to S., which he subsequently paid. Before P. paid this note, however, A. notified him that his note held by P. was obtained from him by fraud, and that he should not pay it.

*Held,* that this information was not sufficient to throw upon P. the risk of paying to S. the balance due upon the purchase of the note, because, under the circumstances of the case, P. could not have obtained satisfactory information whether S. had defrauded A. or not, by an investigation conducted in the usual course of business; it having required, in order to settle that question, a long litigation, in the course of which a jury failed to agree upon it.

*Held,* therefore that A. was liable to pay to P. the note transferred to him by S.; but not to pay to S. the other note retained by him, the prosecution of which was accordingly enjoined.

Adams *v.* Soule et al.

When the *bona fide* purchaser of a negotiable note gives his own note for the price of the purchase, he is to be regarded as a holder for value, in the commercial sense.

BILL IN CHANCERY. The material points in the case are sufficiently stated the opinion of the court.

J. *Maeck,* for the orator.

*Roberts & Chittenden,* for the defendants.

BARRETT, J. The bill in this case sets forth and charges that the orator was induced, by the fraud of Soule, to purchase in a lease-hold interest and fixtures which Soule had in certain bowling-alley property in Burlington, belonging to the orator, as landlord, and therefor to execute to Soule his two negotiable promissory notes for seven hundred and fifty dollars each, one payable to said Soule on demand, the other six months from the date, which was the 12th day of October, 1848; the latter of which notes is claimed to be owned and held by Putnam *bona fide* and for valuable consideration; that the former of said notes had been put in suit in the name of said Soule; and that Putnam was trying to sell, and was threatening to collect the latter of said notes when it should become due and payable; and charging that Putnam was the confederate of Soule, and was not the owner of said note, and did not pay anything for it, but falsely pretended to be such owner to enable Soule to effectuate his fraud upon the orator.

Soule in his answer denies the alleged fraud, and insists that the transaction consummated by the giving of said notes was honest and *bona fide* on his part.

Putnam in his answer sets forth and insists that he bought said note while current, in good faith, and paid Soule therefor seven hundred dollars; viz: three hundred dollars in money, and four hundred dollars, by his own negotiable note, payable to said Soule on demand; which he paid from time to time before the note bought by him fell due; and he denies all knowledge of the fraud charged at the time of said purchase.

The answers were traversed, and proofs were duly taken and

filed, and the cause was heard in the court of chancery, and passed by appeal to the supreme court; and by this court was remanded, with directions that certain issues of fact should be tried by a jury in Chittenden county court. This was done in conformity with the mandate, and the case was reported back to the court of chancery, with the proceeding and verdict of the jury. The jury found a verdict upon all the issues submitted, except a portion of the third, as to which they were unable to agree. The court of chancery received the report, and, (no proceeding being taken to have a new trial by jury) proceeded to dispose of the case by a decree, from which an appeal was taken, and so it is now before us for decision.

Upon a preliminary question, made in this court and fully argued, it has already been decided, that, upon the return of the proceedings and verdict in the court of law into the court of chancery, the latter court might, in its discretion, order a new trial in the court of law, or proceed and determine the case without further aid from a jury; and as no motion had been interposed for a re-trial by jury, that the case was properly before the court of chancery to be determined; and of course properly in this court upon appeal.

In view of the manner in which the case now comes before this court, we see no occasion to exercise the prerogative which is claimed for the court of chancery, viz: to disregard and override the verdict of the jury on those issues on which they were able to, and did agree. For upon the first main question, viz: whether the notes were obtained of the orator by the fraud of Soule, we have no difficulty, upon the proofs, in connection with the findings of the jury, in arriving at a result.

On the *first* issue the jury found that Soule did not, on or about the 9th day of October, 1848, knowingly and falsely represent to the orator the earnings of said bowling-alley, for the first six months after it went into operation, at a *much greater sum more than the earnings really were.*

On the *second* issue, the jury find that the orator was not induced to enter into the contract referred to in this issue, *chiefly* by said Soule's representations of the amount of the earnings of the bowling-alley for the first six months after it went into

Adams *v.* Soule et al.

operation, nor induced thereby to pay said Soule therefor a sum greatly disproportionate to the true value thereof.

On the *third* issue, the jury find that the complainant did pay said Soule a price for said bowling-alley and fixtures greatly above the value thereof, and was induced to do so *chiefly* by the overtures of said Randall, named in said bill, to purchase of the orator the whole property, at a price above its true value, and above what said Randall considered it worth. Whether Soule was confederated with Randall in this transaction, the jury did not agree about, it being a part of said *third* issue submitted for them to find.

The *first* issue was inquiring as to the existence of an alleged instrumentality in the perpetration of the alleged fraud, in the fact that Soule represented the earnings of the bowling-alley at a much greater sum than they really were. The *second* issue seems to be predicated upon the first, and designed to have substantial importance only in case the first issue should be found for the orator. That failing, it followed as matter of course, that, to a modified extent, the second would fail also; and hence it was drawn and the verdict found in the measured language, viz: that the orator was not *cheifly* induced to enter into said contract by Soule's representations of the amount of the earnings, etc., nor *induced thereby* to pay Soule therefor a sum greatly disproportionate to the value thereof. But neither of these findings precludes the idea, that Soule did, knowingly and falsely, represent the earnings to be *somewhat more*, in distinction from " a much greater sum more," than they really were; nor that the orator, *in part*, in distinction from *chiefly*, was induced by said representations of Soule of the amount of earnings, to enter into said contract, and to pay for said property a sum greatly disproportionate to the true value thereof.

In this view of the findings of the jury upon the first two issues, in connection with their finding upon the third ; viz: that the orator did *in fact* pay Soule for said property a price greatly above the value thereof, and was induced to do so *chiefly* by the overtures of Randall to purchase of the orator the whole property, at a price above its true value, and above what Randall considered it worth, the question whether Soule was confederated

with Randall in this transaction, assumes its true significance and importance in the case. For, if it should be found that Randall was falsely, and with fraudulent intent, making such overtures to the orator, and they had the effect to cause him to trade with Soule, giving him a price *greatly above* the true value of the property, then of course, if Soule was confederated with Randall in his making of such overtures, he was participant in the fraud, and must stand subject to the consequences of it.

It therefore devolves on us to ascertain what facts are proved by the evidence. It can only be of service to state results, without presenting an analysis, and prosecuting a discussion of the evidence.

In consonance with the finding of the jury, we are satisfied that the orator bought out Soule's interest in the bowling-alley property, and executed to him the two notes in question, in consequence of the representations made by Randall that he would buy the entire property of the orator, and pay him four thousand and eight hundred dollars, on the terms set forth in the bill, if the orator would buy up Soule's interest, and give a clear title and immediate possession.

We have entire unanimity in finding also, (what the jury were unable to agree about,) that Soule and Randall were confederated and acted in concert—Randall acting the part he did, by the procurement of Soule, and with the fraudulent intent of inducing the orator to buy up Soule's lease and interest in the property at an exorbitant price, and with no design or wish either to purchase or rent the property of the orator; that the various representations that were made to the orator, both by Soule and Randall, as to the profitableness of the bowling-alley business, were preludes and preliminaries, designed by them to excite and encourage the expectation of the orator of making a beneficial disposition of the property; and were designed to, and did operate to give the orator confidence in the good faith and reality of Randall's offers to purchase, for the sum, and upon the terms proposed by him, as set forth in the bill; that for any other purpose than that of clearing the title to the property, so as to be able to effectuate the sale to Randall, the orator would not have bought up Soule's interest, paying one thousand five hundred

Adams *v.* Soule et al.

dollars, a sum found by the jury " greatly to exceed the value thereof ;" that this purchase was not only without benefit, but was a source of serious loss, to the orator ; with all which fraud Soule must stand chargeable, both as the author and co-perpetrator.

The counsel for the defendants make the point, that, as the court, amongst other questions, referred that of the confederacy of Soule with Randall to the jury, and the jury were unable to find such confederacy, it would be inconsistent with such reference, and improper, now, for the court to undertake to pass upon that question ; upon which it seems proper to remark, that the court, in making the reference, were not in trouble *solely* as to the question of confederacy ; but, (as the issues that were directed show) as to what inducement operated mainly on the orator, causing him to buy out Soule's interest. In this latter respect the jury have come to the aid of the court, by finding, that it was *chiefly* the overtures of Randall to purchase the whole property of the orator. *Non constat*, if the evidence had been clear and satisfactory to the court, on the subject of such inducement, that it would have found occasion to order any issues to be tried by jury; but finding such occasion to make such order, it was regarded proper to refer the question of the alleged confederacy of Soule, as an incident, and part of the issue as to the inducement held out to the orator by Randall. However this may be, it is, in our opinion, clear law, that the case is now before this court on the whole record : and that the court of chancery is to regard the judge's report of the trial at law, "with a view to determine whether the information collected before the jury, together with that which appears upon the records in the court of chancery, is sufficient to enable it to proceed satisfactorily, to which it did not conceive itself competent before." 2 Smith, Ch. Pr. 87, citing *Bootle* v. *Blundell,* 19 Ves. 504. The same is stated to be the rule in 2 Daniel's Ch. Pr. 1306, citing the same case.

This disposes of another point made on the argument, viz: that, as the orator was not a witness in the suit at the time of the original trial in the court of chancery, and as his testimony was not in the case till he testified in the trial in the court of law, the testimony he thus gave is to be excluded from consider-

ation, and only that evidence is to be considered, which was in the case at the time the issues were made and sent to the court of law ; for the rule of law, as above cited, carries prominently the idea, that not only what appears upon record, but *the information collected before the jury*, as shown by the judge's report, is to be regarded by the court of chancery, with a view to enabling that court to determine whether it can proceed satisfactorily to a final result.

Another suggestion is made by the learned counsel for the defendants, and authorities cited, *viz*: that what was done by Randall was in the character of *puffing*, with a view to creating a desire in the orator to sell the property ; and so was not a matter of which fraud could be predicated, either in law or equity.

As to this, it is worthy of remark, that the *puffing*, which the books and cases treat of as allowable, is that recommendation and representation which one naturally makes of his own property, for the purpose of convincing the purchaser, of its desirableness ; to which the maxim applies " *Simplex commendatio non obligat.*" " The seller represents the quantities or value of the commodity, and leaves them to the judgment of the buyer ; and of this character are all the cases cited." 1 Story's Eq. sec. 201.

This differs very widely from the case we are dealing with, in which the evidence shows a fraudulent confederacy and combination between Soule and Randall, by which Randall was not only to pretend to a full knowledge of the value of such property and business, and, as a professed *adept*, to represent accordingly to the orator, but at the same time was to negotiate in detail, and in apparent good faith, a purchase of the property, with a view to going into the business, provided the orator would make a clear title, and give immediate possession, by buying out Soule's interest.

The trap was skilfully prepared, and the bait adroitly adapted to cause the orator " to put in his foot," and it worked to perfection. But it was a *trap* after all,—set, baited and managed for the perpetration of the grossest of frauds. It would certainly require a new section, at least, in the books of equity law to embody such a case as one of the " *simplex commendatio quae non obligat.*"

And this leads us to remark upon another suggestion made, in

behalf of the defendants, viz : that the orator was unduly greedy to sell his property to Randall, for a price much above what he knew to be its value, and so was acting unconscionably towards him, and therefore has precluded himself from the right to invoke relief in a court of equity.

As to this, it seems sufficient to say, that Randall not only made the representations of the value of the property, but himself introduced and proposed the project of making a purchase, and himself proposed the terms on which he would purchase, predicated upon, and in keeping with, his representations as to the value of the property and business. *He* sought the orator, not the orator him. *He*, and not the orator, did the *puffing*. *He* offered the price, instead of the orator's asking it. All that the orator did, was to accede to the offer made by Randall, and set about enabling himself to comply with its terms. It would now seem in ill grace, if not impudent, for Soule and Randall to say, that the orator was so greedy for the bait, as not to be entitled to have their gripe relaxed by any power that is commissioned to regard justice between the parties. Indeed, we can but wonder at the facility, with which the orator was duped by the practices which those two rascals brought to bear upon him ; and we can but feel that his folly merits the experience he is reaping, as a victim of the fraud, and as a suppliant at the court of chancery for relief. At the same time, we think a proper administration of the functions of that court would not turn him away wholly unrelieved.

It remains to consider the case in reference to the defendant, Putnam.

The jury found on the fourth issue, that Putnam bought the note, payable in six months and paid therefore the sum of three hundred dollars in money, and gave his own note to said Soule for four hundred dollars " before said Putnam knew, or had any reason to suspect, or believe, that said complainant claimed to have a just defence to them " (said two notes.)

In the stating part, the bill contains no averments as to Putnam ; but under the *charge* of Soule's confederating, it is charged against Putnam, that " he pretends that he hath purchased of Soule said note, and is the lawful owner thereof, and hath paid

35

money or other valuable consideration for the same ; * * * and pretends that, previous to his becoming the owner of said note, he had no knowledge or intimation that said note was procured of the orator by fraud, or that the consideration thereof could in any wise be impeached : whereas, it is charged, that Putnam is not the lawful and *bona fide* owner of said note, and hath not paid any consideration therefor, but falsely pretends to be the owner of said note, for the purpose of enabling said Soule more effectually to defraud the orator ; or, if the said Putnam now has any interest in said note, the orator charges that he has acquired such interest after full knowledge of the fraudulent means made use of by said Soule to procure said note of the orator, or after said Putnam had reason to suspect or believe the said note was invalid as between the orator and said Soule."

The answer of Putnam sets forth, and the proof shows, that he purchased said note on the 20th of October, 1848, paying three hundred dollars at the time, and giving his note for four hundred dollars, payable to said Soule or order on demand and interest ; which he paid by advancing to Soule different sums, from time to time, amounting, the last of December or fore part of January, to one hundred and fifty dollars ; and then paid the balance in money and took up the note ; and that Soule transferred and delivered said seven hundred and fifty dollar note to Putnam on the day of said purchase of it.

Putnam states in his testimony on the trial by jury, that, a few days after he bought said note, he went to Burlington, and stayed through two days ; and while there, the orator told him there was a defence to the notes, and asked him if he owned them ; to which Putnam replied that he had bought and owned one of them. The orator testified that, about the 24th of October, 1848, Putnam came to him, and he told him, (Putnam,) that the notes were obtained by fraud, and he should not pay them ; and that on the 26th of October, 1848, he published a notice, cautioning any one against buying the notes.

In view of the proofs, the verdict of the jury, and the report of the judge of the trial by jury, in connection with the fact, that no steps were taken to get a re-trial of the issue by a jury, we are satisfied to take the verdict as establishing the facts found by it.

This brings us to consider the legal consequences resulting from these facts.

It must be assumed that Putnam purchased the note while current, (eight days after it was made ;) that he paid seven hundred dollars in money ; that it was transferred and delivered to him at the time of the purchase.

The note being payable to *bearer*, a delivery of it without endorsement constituted a valid assignment under the law merchant.   1 Sel. N. P. 341.

So far as the three hundred dollars paid at the time of the purchase, is concerned, without question Putnam became the holder for value in the commercial sense.   But it is denied that beyond this, and in respect to the four hundred dollars, he can be so regarded, for the reason that he paid it after he had notice of the alleged fraud.   We suppose it settled, that, where the purchaser of a negotiable note gives his own for the price of the purchase, he is to be regarded as a holder for value, in the commercial sense.   Edwards on Bills and Prom. Notes p. 322, and cases there cited.   But it is strongly urged that Putnam cannot be protected as to the four hundred dollars paid on his note to Soule, on the ground, that after being informed of the alleged fraud, it was his duty to have withheld and refused such payment.   And it is insisted upon this point, that his answer is insufficient to entitle him, as to said four hundred dollars, to avail himself of the rights of a *bona fide* holder of the seven hundred and fifty dollar note, without notice of fraud, because it does not deny notice at any time *before said payment*, as well as at the time of the purchase.   On this subject, it should be in mind that the bill only *charges* that Putnam "was not the lawful and *bona fide* owner of the note, and hath not paid any consideration therefor, but falsely pretends to be the owner for the purpose of enabling Soule more effectually to defraud the orator," etc.

To all which, and to the interrogatories predicated thereon, the answer is full, explicit and circumstantial.   No suggestion is made in the bill of rights and duties resting on the fact, that part of the purchase money was paid after the orator notified Putnam of the alleged fraud.   All that there is in the case upon this subject, is introduced solely by, and arises upon the

evidence. In order for the orator to take and maintain his point upon the omission in the answer in this respect, he ought, either to have introduced the subject by proper averment or charge in the bill, or, at least, taken exception in one form to the answer, for the alleged insufficiency. The issue was made upon the charges and averments in the bill and answer, and has been acquiesced in down to the present stage of the case. The issue for the jury, as to the relation of Putnam to the transaction, shows that this point of notice of the fraud before the payment of said four hundred dollar note had not, up to that time, been made in the case, either upon the pleadings, or the evidence. The fact of such notice is first brought into the case in the testimony given by the parties on the jury trial. It is much to be doubted therefore, whether the question can now be legitimately raised.

Nevertheless, as these facts of payment and notice of fraud are thus in the case, and stress is laid upon them in the argument, we do not decline to consider the point made upon them on account of the irregular manner in which it is now raised.

Putnam having title to the seven hundred and fifty dollar note under the law merchant upon a *bona fide* purchase, and so to be protected as to what he paid at the time of the purchase, the question is whether the information which he received from the orator a few days after the purchase, is to be held as operating *in equity* to invalidate his *legal* right to and in the seven hundred and fifty dollar note, so far as the consideration for the purchase of it consisted in said four hundred dollar note, and the payment of it in the manner and at the time above stated. Upon this question a class of cases of frequent occurrence is referred to, the doctrine of which is well established, and in which the question has arisen between a pretended purchaser of real estate and a prior incumbrancer or lien holder. In these cases it has been held that the purchaser is affected with the notice of the incumbrance or lien at any time before actual payment, even though he may have given securities by bond or note at the time of such purchase. Such is the case of *Jewett* v. *Palmer*, 7 J. C. 65, as well as the cases there cited from the 1st and 2d of Atkin's Reports. Such is the authority of 2 Leading Cas. in Eq. 111, and cases there cited. See also pp. 80, 81. Without undertak-

Adams *v.* Soule et al.

ing an analysis of the numerous cases upon this subject, it will fully serve the purposes of the present question to inquire whether this case furnishes an occasion for the application of that general doctrine.

The subject matter of the notice in this case was a fraud alleged to have been practiced by Soule on the orator, in obtaining said note of seven hundred and fifty dollars ; not an incumbrance or lien existing upon a parcel of existing property. Whether such fraud had been practiced was not ascertainable by existing evidences that were available and certain, as would be the case in respect to liens and incumbrances on real estate. We think it a sound proposition, " that in whatever mode information may be acquired, it must not only be such as to alarm the purchaser, and put him on inquiry, but it must also be sufficient to enable him to conduct that inquiry to a successful termination, for otherwise the general rule that a title shall not be impeached by uncertainties, will intervene for the protection both of the vendor and purchaser." 2 Lead. Eq. cases, p. 116.

Now for its application to the present question.

The case presents the simple fact communicated to Putnam by the orator, that the notes had been obtained of him by fraud, and that he should not pay them.

This appears to have alarmed Putnam, for he told the orator that he didn't want a suit, and he would try to get out of the matter by getting Soule to take back the note ; and he did apply accordingly to Soule, but without success. Being thus alarmed, and put on enquiry, suppose he elicited from the orator his account of the means and manner of the alleged fraud, as the same is set forth in the bill, and also elicited from Soule and Randall all they would tell him on the subject, and they had assured him, as they probably would, that the transaction between them and the orator was honest and in good faith, would he have been so *free from uncertainty* as to the existence of the alleged fraud, or have arrived at such reasonable certainty, as to impose on him the duty of assuming the existence of the alleged fraud, and of governing himself accordingly ? The history of this litigation would seem to furnish a most ample answer.

With the case upon bill, answer, and all the proofs that could

be taken and used, including not only the testimony of the parties, but of a great array of witnesses, a jury of discreet men found against the orator, as to two grounds or means of the alleged fraud, and were unable to agree as to a vital element in the third ground or means of said fraud ; wherefore it has become necessary for this court, with all the help afforded by the findings of the jury, to settle this question of fraud, alleged by the orator to have been perpetrated on him by Soule.

Now in 2 Lead. Cases in Eq. 116, it is said, (citing *Bellas* v. *McCarty*, 10 Watts 26,) " that it will therefore be a sufficient answer, in all cases, to an allegation of notice, to show that the purchaser could not have obtained the necessary information by an investigation conducted in the usual course of business ;" and we regard this to be a comprehensive statement of a sound doctrine.

It is difficult to conceive of a case, in which it would be more fruitless, to attempt to elicit by enquiry, and in the usual course of prosecuting such an investigation, without a resort to a judicial form, any reasonable certainty as to the fact of fraud. And it does not seem to be directly claimed, (and if it is, we think no case can be found to justify it;) that Putnam was put to the alternative of paying that four hundred dollar note at his peril, or taking the burden of establishing the fraud, either in defence to a suit upon that note, or by a bill to enjoin Soule from using or enforcing it. And yet, such would have been his posture, as the result of holding, as we are asked to, by the orator.

Though not important, still it seemes proper to remark, if the orator would have put himself in a posture entitling him to claim, to the fullest extent, what he now claims to be his equitable right against Putnam, he ought, at the time he informed Putnam of the fraud, to have ascertained, or at least, enquired into, the precise manner in which Putnam had become the purchaser of the seven hundred and fifty dollar note, and if he had learned, as he probably would have done, that said four hundred dollar note had been given towards the purchase, he should have proceeded either to restrain Soule from receiving, and Putnam from paying. the money thereon due, or to give Putnam an indemnity against it, thus taking on himself the burden of establishing the fraud, against which he was claiming immunity.

Adams v. Soule et al.

This view of this point has been taken, without making any question, whether the doctrine of the cases and books cited is applicable to a case of the character of the one now before us. And yet it seems proper, before dismissing the subject, to remark, that the doctrine of which the orator claims the application and benefit, is one purely of the court of equity, and, so far as we have been able to examine, has been applied only in cases where equitable rights, that are only to be administered by that court, have been brought in conflict with the *legal* title to property ; as where it has been sought to clear a legal title of a claimed *equitable* incumbrance or lien ; or to enforce such incumbrance or lien against a claimed *legal* title, when such equitable right is attached to the subject matter thereof, and underlies and subordinates the legal title. This class of cases is well illustrated by that cited *supra*, 7 J. C. which was for the enforcement of an equitable lien for the purchase money.

Now, it seems quite clear, that the present case, in its material features, stands upon a wide distinction from those cases.

Soule received the notes as the payee. He transferred one of them to Putnam, for a valuable consideration, thus investing Putnam with the *legal* title. The orator did not frame his bill, nor prosecute this suit, upon the idea of an *equitable lien* upon the note, as security for the honesty and good faith of Soule in the transactions in which the notes were given ; but solely on the ground of a fraud, that gave him distinct *legal* rights of defence to said notes, that were as proper to be enforced in a *legal*, as an equitable form. The need of discovery and of injunction, predicated upon the alleged fraud, was the only reason of necessity for resorting to the court of chancery ; and but for that need, the orator would have found no access to that court,—certainly not after suits at law should have been brought. Having entered that court for the purpose of obtaining discovery and injunction, with a bill and evidence as to the alleged fraud, the case has been retained, in accordance with familiar rules, for the purpose of full relief. But this is by no means on the ground and score of an equitable lien or right attached to, and following the notes, which could only be recognized and made faithful in a court of equity.

Adams *v.* Soule et al.

It is seriously questionable, therefore, whether the parties stand on any different ground in respect to rights and liabilities in the court of Chancery, from what they would in the court of law—whether the orator can claim any larger effect of the facts against Putnam under this bill, than he could claim as defendant in suits at law against him on the notes.

It is obvious that, as Putnam was not affected by knowledge of the fraud of Soule, when he purchased the seven hundred and fifty dollar note of him, and paid a valuable consideration therefor, he would be regarded, at law, as a *bona fide* holder, by an indefensible title, in no manner affected by the fact of paying part of the purchase money after being informed of the alleged fraud of Soule. *Kingsbury* v. *Smith*, 13 N. H. 109, and many cases cited.

In my own view, the orator stands in the same posture, as to rights against Putnam, under this bill, that he occupies as defendant in the suit at law on the note ; and no case has come under my observation indicating to the contrary.

It is quite apparent, that the learned solicitor, in drawing the bill, was acting under the influence of this view solely ; for, as before intimated, he has charged and sought discovery only of matters that would constitute a *legal* defence to the note ; in no manner insinuating, or eliciting any thing, as to a claim for relief, on the ground that Putnam paid the four hundred dollars in money, after he was informed by the orator of the fraud of Soule.

In view of the whole subject, as it is now before us, we think the orator is not entitled to assert against Putnam an equity that will countervail Putnam's legal title and rights, as the purchaser and holder of said seven hundred and fifty dollar note.

On the whole case, our result is, that, as to Putnam, the bill be dismissed with costs—that Soule be perpetually enjoined from prosecuting said suit upon, and from in any manner enforcing said note, payable on demand, and that he pay the costs of the orator, and also pay to the orator the costs recovered of the orator by Putnam, and that the case be remanded to the court of chancery, to be there proceeded with to a final decree, conformably to these directions.